JACK L. EASSON, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 67201, 67457, 67508. Filed February 29, 1960.

*Nathan L. Cohen, Esq.*, and *Ralph R. Bailey, Esq.*, for the petitioners.

*Melvin L. Sears, Esq.*, and *Jack T. Fuller, Esq.*, for the respondent.

FORRESTER, *Judge:* The Commissioner has determined deficiencies in the income tax liability of Jack L. Easson, June B. Easson, and the Envoy Apartments as follows:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 67201 | Jack L. Easson | 1952 | $183,915.29 |
| | | 1953 | 1,112.66 |
| 67457 | June B. Easson | 1952 | 183,915.29 |
| | | 1953 | 1,112.66 |
| 67508 | Envoy Apartments | 1953 | 4,085.54 |

[1] The following proceedings are consolidated herewith: June B. Easson, Docket No. 67457, and Envoy Apartments, Docket No. 67508.

The issues for decision are:

1. Whether the exchange of an apartment house subject to a mortgage for all the capital stock of a newly organized corporation was within the nonrecognition provisions of sections 112(b)(5) and 112(k) of the Internal Revenue Code of 1939.

2. Whether, if gain is recognized, such gain will be treated as ordinary income under section 117(o) of the Internal Revenue Code of 1939.

3. The tax basis of the property in the hands of transferee corporation.

Our holdings on the above issues make unnecessary any statement of alternative positions. Because of certain concessions of the parties a Rule 50 computation will be necessary.

FINDINGS OF FACT.

Some of the facts have been stipulated and are so found.

Jack L. Easson filed joint Federal income tax returns with June B. Easson, who was then his wife, on a calendar year basis for the taxable years 1952 and 1953 with the district director of internal revenue for the district of Oregon. The Eassons were later divorced and each was thereafter issued an identical statutory notice. Jack L. Easson will hereinafter be referred to as the petitioner. The Envoy Apartments filed its Federal income tax return for its taxable year ending September 30, 1953, with the director of internal revenue for the district of Oregon.

In 1929, the petitioner constructed and owned an apartment house located at 2336 SW Osage St., Portland, Oregon, and hereinafter referred to as the property. On January 16, 1930, the Envoy, Inc., an Oregon corporation, hereinafter referred to as the old corporation, was formed for the purpose of owning and operating the property, which was transferred to it.

On April 2, 1951, the old corporation was liquidated, and at that time the petitioner was the beneficial owner of all of its stock. The liquidation of the old corporation was effected pursuant to section 112(b)(7), and petitioner took the property at the same adjusted basis and estimated life as it had had on the books of the old corporation.

Upon the liquidation of the old corporation, the petitioner operated the property as a sole proprietorship. On March 25, 1952, the petitioner encumbered the property with a $200,000 mortgage, which was to be retired over 10 years and had an interest rate of 4½ per cent per year. On June 19, 1952, the mortgage of March 25 was paid off with the proceeds of a new mortgage of $250,000, which was to be retired over 15 years with interest at 4½ per cent per year. Petitioner signed and was personally liable on each of the above mortgage notes.

The Envoy Apartments, an Oregon corporation and hereinafter referred to as the new corporation, was formed on October 1, 1952. The petitioner transferred the property, still subject to the mortgage, to the new corporation in exchange for all of its capital stock. The principal balance of the mortgage, on which the petitioner remained personally liable, equaled $247,064.01 at the time of this exchange, and the basis of the property in the hands of the petitioner at that time was $87,214.86, of which $21,858.28 was attributable to land and $65,356.58 to the building.

It has been stipulated that the fair market value of the property at the time of the exchange in October 1952 was $320,000, allocated $30,000 to land and $290,000 to the building.

The petitioner had decided to sell the property in 1951, believing that if he were in a liquid position, he would be able to take advantage of what he thought was an imminent break in the general price structure of investments. However, the petitioner realized that the property had appreciated in value, and sought and received tax advice on how to proceed so as to incur the least amount of tax liability. He was advised that if the old corporation sold the property, it would pay a tax on the gain, and that he would then have to pay another tax when the net proceeds of the gain were distributed to him. The petitioner liquidated the old corporation under section 112(b)(7) to avoid this double-tax burden.

As early as February or March of 1951, the petitioner discussed the possibility of placing a mortgage on the property, and he was advised and believed that the existence of a maximum mortgage would facilitate its sale.

Efforts to sell the property, which had commenced prior to the liquidation of the old corporation, were hampered by the availability of a significant number of new FHA housing projects, known as 608's. These projects, built with borrowed funds guaranteed by the Federal Government, were mainly completed by 1951, and had the effect of downgrading the petitioner's property from class A to class B. Although petitioner received offers to trade the property for other real estate, he refused these offers because he wanted to sell it for cash.

By October 1952, petitioner became of the opinion that he could not sell the property for cash, and he then decided to retain it. Petitioner believed, because of the following factors, that it would be better to thereafter operate the property in corporate form, as he had done for over 20 years. The limited liability afforded by the corporate shield appealed to petitioner because it would insulate his other assets from possible liabilities arising due to the operation of the property, and it would make it easier for him to turn the management of the property over to a local real estate organization if he should decide to live elsewhere.

Also, petitioner had been divorced once and was having marital troubles with his second wife in the fall of 1952 which led to their subsequent divorce. One of his daughters by his first wife was ill with a malignancy and petitioner wished to have the property in corporate form in order to facilitate its division among his heirs-to-be and exempt it from potential marital claims.

In conjunction with petitioner's desire to attain a liquid position for investment purposes, he sold all his stocks during 1951 and 1952, and, on June 30, 1952, a mortgage was placed on a warehouse held by the J. L. Easson Investment Company, the stock of which was owned by petitioner. The proceeds from the warehouse mortgage and the mortgage on the Envoy Apartments were invested in 90-day United States Government bills. Said investments, and petitioner's overall liquid position, have been maintained by petitioner up to the trial of this case.

The new corporation has been maintained as a separate entity from its inception and constitutes a functioning corporate organization and is not a sham.

Petitioner has established by the clear preponderance of the evidence that his principal purpose in exchanging the property subject to the mortgage for all the capital stock of the new corporation was not to avoid Federal income tax on the exchange, and that he had a bona fide business purpose in so transferring the property.

OPINION.

1 and 2. Petitioner contends that his exchange of the apartment house property subject to the mortgage for all the capital stock of the new corporation in October 1952 qualifies under the nonrecognition provisions of section 112(b)(5)[2] as modified by section 112(k).[3]

---

[2] SEC. 112. RECOGNITION OF GAIN OR LOSS.

   (b) EXCHANGES SOLELY IN KIND.—

   *       *       *       *       *       *       *

   (5) TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; * * *

[3] (k) ASSUMPTION OF LIABILITY NOT RECOGNIZED.—Where upon an exchange the taxpayer receives as part of the consideration property which would be permitted by subsection (b) (4), (5), or (10) of this section to be received without the recognition of gain if it were the sole consideration, and as part of the consideration another party to the exchange assumes a liability of the taxpayer or acquires from the taxpayer property subject to a liability, such assumption or acquisition shall not be considered as "other property or money" received by the taxpayer within the meaning of subsection (c), (d), or (e) of this section and shall not prevent the exchange from being within the provisions of subsection (b)(4), (5), or (10); except that if, taking into consideration the nature of the liability and the circumstances in the light of which the arrangement for the assumption or acquisition was made, it appears that the principal purpose of the taxpayer with respect to the assumption or acquisition was a purpose to avoid Federal income tax on the exchange, or, if not such purpose, was not a bona fide business purpose, such assumption or acquisition (in the amount of the liability) shall, for the purposes of this section, be considered as money received by the taxpayer upon the exchange. In any suit or proceeding where the burden is on the taxpayer to prove that such assumption or acquisition is not to be considered as money received by the taxpayer, such burden shall not be considered as sustained unless the taxpayer sustains such burden by the clear preponderance of the evidence.

In determining whether the exchange involved herein qualifies for nonrecognition of gain under section 112(b)(5) and (k), we cannot look solely to the literal language of these sections, but must construe them with reference to the purpose for which they were enacted. This is a time-honored rule of statutory construction. In the case of *Holy Trinity Church* v. *United States*, 143 U.S. 457, 459, the Supreme Court, in interpreting and applying a statute, said:

It is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers. This has been often asserted, and the reports are full of cases illustrating its application. *This is not the substitution of the will of the judge for that of the legislator,* for frequently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the *absurd results* which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act. * * * [Emphasis supplied.]

In *Brons Hotels, Inc.*, 34 B.T.A. 376, 381 (1936), where the petitioner relied upon and contended for a literal, rather than a practical, interpretation of section 112(c)(1) of the 1928 Act (now section 112(c)(1), I.R.C. 1939), we stated that:

It is a cardinal principle that in construing a statute the intention of the law-making body should prevail and, if a literal interpretation of a part of a statute operates unjustly or leads to absurd results, or is contrary to the evident meaning of the act taken as a whole, it should be rejected [citing cases].

Taxation is a highly practical matter. The revenue act must be construed as a whole, and a sensible construction, one which will effectuate the legislative intention, should be given * * *. The various sections of the act should be so construed that one section will explain and support and not defeat or destroy another section * * *

And the Supreme Court, in construing a recognition provision of the Code in *Crane* v. *Commissioner*, 331 U.S. 1, said, at page 13, that "one section of the Act must be construed so as not to defeat the intention of another or to frustrate the Act as a whole."

We again stated, in essence, that a provision of the Internal Revenue Code cannot be interpreted or applied in a vacuum in the case of *Mary A. Marsman*, 18 T.C. 1, 12 (1952), affirmed on this issue 205 F. 2d 335 (C.A. 4, 1953), where we set forth the following:

Any provision of a given statute must be read, however, in conjunction with the other provisions of the statute, keeping in mind *the purpose for which the statute or the particular provision thereof was enacted.* And where the language of a provision, standing alone, would produce results plainly at variance with the *purpose of the legislation as a whole,* the Supreme Court has said that such purpose, rather than the literal wording of the provision, should be followed. *United States* v. *American Trucking Associations, Inc.,* 310 U.S. 534. In that case the Supreme Court, in its opinion, at pages 543 and 544, said:

"There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to

its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When that meaning has led to absurd or futile results, however, this Court *has looked beyond the words to the purpose of the act.* Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' this Court has followed that purpose, rather than the literal words. When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.' * * *" See also *Vermilya-Brown Co.* v. *Connell,* 335 U.S. 377; *United States* v. *Dickerson,* 310 U.S. 554, 562; *Haggar Co.* v. *Helvering,* 308 U.S. 389; *Gregory* v. *Helvering,* 293 U.S. 465; *Helvering* v. *New York Trust Co.,* 292 U.S. 455. [Emphasis supplied.]

Prior to the Internal Revenue Act of 1921, the property received on any exchange was treated, to the extent of its fair market value, as the equivalent of cash received for the purpose of determining gain or loss, and this principle was applied to an exchange of property for the stock of the transferor's controlled corporation inasmuch as the corporation was recognized and treated as an entity separate and distinct from the transferor. However, such taxation seriously interfered with necessary business readjustments, since it resulted in the taxation of technical gains produced solely by changes in the mere form of the investment held or business carried on by the transferor.[4] To remedy this situation, Congress passed section 202(c)(3) of the 1921 Act. Legislative history shows that section 202(c)(3) of the 1921 Act is the forerunner of section 112(b)(5) of the 1939 Code, and was designed to permit formal and organizational business readjustments without recognition of technical or paper profit gains produced by the separate entity concept.[5] *Helvering* v. *Cement Investors,* 316 U.S. 527, 533 (1942). Thus section 112(a)[6] provides that gain or loss shall be presently recognized on all sales or exchanges, and section 112(b)(5) subsequently provides one of the exceptions to that general rule and defers recognition until some later, taxable event has occurred.

In interpreting section 112(b)(5), the Supreme Court in *United States* v. *Hendler,* 303 U.S. 564, held that if a taxpayer's liabilities were assumed and paid by another party in what was otherwise a tax-free reorganization, then gain was to be presently recognized *to the extent of such assumption and payment.*

---

[4] H. Rept. No. 350, 67th Cong., 1st Sess. (1921), p. 10; S. Rept. No. 275, 67th Cong., 1st Sess. (1921), p. 11.

[5] See H. Rept. No. 179, 68th Cong., 1st Sess. (1924), p. 13; S. Rept. No. 398, 68th Cong., 1st Sess. (1924), p. 14.

[6] SEC. 112. RECOGNITION OF GAIN OR LOSS.

(a) GENERAL RULE.—Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 111, shall be recognized, except as hereinafter provided in this section.

Faced with this decision, Congress reiterated its desire to postpone taxation on technical gains by passing what is now section 112(k).[7] Therefore, the logical procedure in applying the statute to the type of exchange involved herein is, first, to see if the exchange would otherwise comply with section 112(b)(5), then if it does, except for the liability encumbering the property (mortgage), to apply section 112(k). This seriatim application of the subsections of section 112 is necessary to reach the result expressly desired by Congress.

Section 112(b)(5) is a so-called nonrecognition provision providing for tax deferment in certain instances; consequently, to carry out its purpose, under the doctrine expressed in the *Crane, Brons Hotels*, and *Marsman* cases, all *supra*, it should be so applied that its use will result in *postponing* the taxation of a technical or paper profit gain, and also it should be so applied that it will not produce absurd results or exempt that gain from tax altogether.

In dealing with a parallel situation in *Estate of Theodore Ebert, Jr.*, 37 B.T.A. 186, we stated:

How could such an absurd result be avoided? The nonrecognition provisions were not intended to exempt profits from tax but merely to postpone the tax until later when the property received might be disposed of and the balance of the profit consolidated and recognized. * * *

In the instant case it is clear that there will not be a mere postponement of taxation, but possibly a complete tax exemption, if gain on the exchange in question is not presently recognized to the extent that the mortgage to which the transferred property was subject exceeded the petitioner's adjusted basis.

The above statement is best illustrated through the facts of this case. At the time of the conveyance to the new corporation, the petitioner's adjusted basis on the property was $87,214.86, and the mortgage balance was $247,064.01. This significant difference occurred because depreciation had been taken on the building for over 20 years, reducing petitioner's basis, but during that period the

---

[7] See H. Rept. No. 855, 76th Cong., 1st Sess., pp. 18 and 19, and S. Rept. No. 648, 76th Cong., 1st Sess., p. 3. The Ways and Means Committee Report, *supra*, summarized the situation as follows:

"The recent Supreme Court case of *United States* v. *Hendler* (303 U.S. 564 (1938)), has been broadly interpreted to require that, if a taxpayer's liabilities are assumed by another party in what is otherwise a tax-free reorganization, gain is recognized to the extent of the assumption. In typical transactions changing the form or entity of a business it is not customary to liquidate the liabilities of the business and such liabilities are almost invariably assumed by the corporation which continues the business. Your committee therefore believes that such a broad interpretation as is indicated above will largely nullify the provisions of existing law which postpone the recognition of gain in such cases. To enable bona fide transactions of this type to be carried on without the recognition of gain, the committee has recommended section 213 of the bill.

"Section 213(a) of the bill amends section 112 of the Internal Revenue Code by adding a new subsection (k) which provides that in transactions *otherwise within section 112* (b)(4), (5), or 112(c) or (d) (insofar as they relate to exchanges under sec. 112 (b)(4) or (5)) gain shall not be recognized to the transferor on account of the assumption of liabilities or the transfer of property subject to liability." (Emphasis added.)

property had in fact appreciated, to the stipulated value of $320,000, enabling him to borrow $250,000 on its security. The petitioner's basis for the stock he received from the new corporation is governed by section 113(a)(6), which provides that the amount of the mortgage on the property transferred shall, for the purpose of said section, be treated as money received, and the transferor's basis for the stock shall be the same as that of the property transferred subject to the mortgage, decreased by the amount of the money received, and increased by any gain recognized.

Since the petitioner's adjusted basis on the transferred property was $87,214.86, to deduct the amount of the mortgage on the property, i.e., $247,064.01, would produce a negative basis of minus $159,849.15. Since property cannot have a negative basis,[8] the basis for the stock received by petitioner is zero, and this leads to the same character of absurd results condemned in the *Ebert* case, *supra*, for, starting with a zero base, the petitioner would never be taxed on that part of the gain equal to the excess of the mortgage over the adjusted basis of the property transferred, i.e., $159,849.15. If the petitioner sold his stock for an amount that corresponded to the remaining equity in the property, i.e., $72,935.99 ($320,000 — $247,064.01), he would only be taxed on that amount. Yet, looking at the entire transaction, $320,000 worth of property, with a basis of $87,214.86, could be converted into cash with a taxable gain of only $72,935.99 and the balance of the actual gain, amounting to $159,849.15, would never be taxed.

Thus, we now hold, since the mortgage on the transferred property exceeded its adjusted basis, and since it is this excess of mortgage over base which leads to the absurd and distorted result noted above, that that portion of the property equivalent to such excess does not qualify under section 112(b)(5) and must be presently recognized.

We thus have split petitioner's gain into its component parts of the value of the stock he received, the detriment of his liability not in excess of his basis in the property transferred, and the detriment of his liability in excess of such basis. This is no novel approach. The Supreme Court indulged a comparable splitting of gain in the *Hendler* case, *supra*, and Congress has often followed that lead, *inter alia*, in the enactment of sections 112(k) and 113(a)(6), both *supra*, and section 357(c), I.R.C. 1954, *infra*.

We are aware that the Internal Revenue Code of 1954 reenacted section 112(k) of the 1939 Code as section 357(a) and (b), and also

---

[8] It is a fundamental concept of income taxation to tax gain when its fruits are available for payment of the tax. If a negative base were allowed then recognition of gain could be deferred until a subsequent loss sale or even an abandonment, and unless taxpayer had other resources the tax would never be collected.

added subsection 357(c).[9] This subsection expressly provides that if the amount of the liabilities to which transferred property is subject exceeds the transferor's adjusted basis of said property, such excess is to be presently recognized as gain. We are satisfied, however, that this provision was made to further clarify existing law rather than to amend it,[10] and that section 112(b)(5) was never intended to be so applied as to produce absurd results or to grant tax exemption rather than tax deferment. See *Wilgard Realty Co.*, 43 B.T.A. 557, 562, affd. 127 F. 2d 514 (C.A. 2), certiorari denied 317 U.S. 655, in which case taxpayer contended that section 213(f) of the Revenue Act of 1939 (by which section an exchange was brought within section 112(b)(5), despite the assumption of debt) was unconstitutional because of its retroactive effect on basis. The Board of Tax Appeals held the section constitutional, saying:

> The purpose of section 213 is simply to effect what had always been the intent back of the exchange and reorganization provisions in the several revenue statutes * * *. That intent has always been not to exempt a gain from tax, but to effect "a postponement of tax until the gain is realized by a pure sale or by such an exchange as amounts to a pure sale." * * *

Since that portion of the exchange which is not in excess of petitioner's adjusted basis of $87,214.86 complies with both the letter and the purposes of section 112(b)(5), we now turn to section 112(k).

This section expressly places upon the taxpayer the burden of showing by a "clear preponderance of the evidence" that his *principal purpose* was not to avoid Federal income tax on the exchange and that he had a bona fide business purpose, before nonrecognition of gain is allowed.

The existence of this burden, with respect to the tax avoidance element is now applicable only to the amount of the assumed mortgage liability not in excess of petitioner's base, i.e., $87,214.86, for we have already held that the excess of the mortgage over the petitioner's adjusted basis on the transferred property is to be treated as money received and gain recognized to that extent. Furthermore (as is

---

[9] SEC. 357. ASSUMPTION OF LIABILITY.
  (c) LIABILITIES IN EXCESS OF BASIS.—
    (1) IN GENERAL.—In the case of an exchange—
      (A) to which section 351 applies, * * *

  \*       \*       \*       \*       \*       \*       \*

  If the sum of the amount of the liabilities assumed, plus the amount of the liabilities to which the property is subject, exceeds the total of the adjusted basis of the property transferred pursuant to such exchange, then such excess shall be considered as a gain from the sale or exchange of a capital asset or of property which is not a capital asset, as the case may be.
    (2) EXCEPTIONS.—Paragraph (1) shall not apply to any exchange to which—
      (A) subsection (b)(1) [tax avoidance purpose] of this section applies, * * *

[10] Cf. dicta to the contrary in *W. H. Weaver*, 32 T.C. 411, 436, on appeal (C.A. 4), which case involves a similar exchange but where we found that transferor's principal purpose with respect to the assumption of liabilities was a purpose to avoid Federal income tax on the exchange, which finding makes said section 357(c) inapplicable by its own terms.

developed later in this opinion), most of said excess is being recognized to petitioner as ordinary income.[11] Thus, on the entire transaction, petitioner has succeeded in deferring tax on what was his basis for the property and has obtained capital gains treatment on about 3½ per cent of the presently recognized gain.

With each payment on the mortgage principal by the new corporation, the corporation's equity in the property will rise and, absent other factors, there will be a corresponding increase in the value of the petitioner's stock. Since the basis of the stock in the hands of the petitioner will be reduced to zero pursuant hereto under section 113(a)(6),[12] all postponed gain will be subsequently taxed when the stock is later disposed of.

The respondent has argued that the petitioner is avoiding tax within the meaning of section 112(k) because the new corporation will pay off the mortgage, while he personally received and retained the mortgage proceeds. But if Congress, when speaking of tax avoidance in section 112(k) had meant to include all instances of this practice, it would not have changed the *Hendler* rule by enacting such section. In addition, we have found as an ultimate fact that the petitioner's primary purpose was not to avoid taxes on the exchange.

Even though we have considered the circumstance that the amount of the mortgage exceeded petitioner's basis to be strong evidence of an intent to avoid tax, this has been clearly overcome by the facts set forth in our findings. The record adequately discloses that petitioner's primary purposes in effectuating the exchange in question were to insulate his personal assets against potential liabilities, to eliminate complexities in the management of the property, and to facilitate his estate planning.

Under section 112(k), the burden is also on the petitioner to prove by a clear preponderance of the evidence that he had a bona fide business purpose of the exchange. We believe that petitioner has sustained this burden by the considerations already mentioned. Also, it is established that the new corporation was not a mere "contrivance," such as was found in *Gregory* v. *Helvering*, 293 U.S. 465, in that it is, and has been for over 6 years, a living corporate entity carrying out the active function of owning and managing a large apartment house. Cf. *Estate of John B. Lewis*, 10 T.C. 1080 (1948), affd. 176 F. 2d 646 (C.A. 1, 1949), and *Rena B. Farr*, 24 T.C. 350 (1955).

Petitioner also had a business purpose for neither paying off the mortgage at the time of the exchange nor transferring the proceeds

---

[11] Only $5,590.77 of the total recognized gain of $159,849.15 is long-term capital gain to petitioner.

[12] The zero basis under section 113(a)(6) is computed as follows: Adjusted basis of property was $87,214.86—less mortgage on property of $247,064.01 plus gain recognized of $159,849.15 equals zero.

of the mortgage to the new corporation along with the property. Petitioner has clearly established that he desired to remain in an extremely liquid financial position in order to take advantage of an expected downturn in business and both of the above alternatives would thwart this desire. With respect to the first alternative, attempting to remortgage the property would duplicate costs and might entail enough delay to preempt the making of a quick investment. Under both alternatives, potential investments would be limited to the extent provided for in the charter of the new corporation. However, with petitioner retaining the proceeds of the mortgage on the property, he has unlimited freedom of investment and he can make an investment quicker and with less formality than if the same investment were made by the new corporation.

3. The respondent's final contention is that the gain recognized on the exchange, and which we have determined to be $159,849.15, must be treated as ordinary income under section 117(o).[13] This section provides that, in a sale or exchange of *depreciable* property to a controlled corporation, the gain recognized to the transferor shall be treated as ordinary income.

We find no weight in petitioner's argument that this exchange was not to a controlled corporation since he owned none of its stock immediately prior to the exchange. He acquired the stock as an incident of that very transaction and was the moving party in creating the new corporation for this very purpose. Petitioner was in complete control at all times.

Section 117(o) was added to the Internal Revenue Code of 1939 by section 328 of the Revenue Act of 1951. The underlying purpose of this section is ably brought forth by the following passage taken from the report of the Staff of the Joint Committee on Internal Revenue Taxation:[14]

---

[13] SEC. 117. CAPITAL GAINS AND LOSSES.

(o) GAIN FROM SALE OF CERTAIN PROPERTY BETWEEN SPOUSES OR BETWEEN AN INDIVIDUAL AND A CONTROLLED CORPORATION.—

(1) TREATMENT OF GAIN AS ORDINARY INCOME.—In the case of a sale or exchange, directly or indirectly, of property described in paragraph (2)—

(A) between a husband and wife; or

(B) between an individual and a corporation more than 80 per centum in value of the outstanding stock of which is owned by such individual, his spouse, and his minor children and minor grandchildren;

any gain recognized to the transferor from the sale or exchange of such property shall be considered as gain from the sale or exchange of property which is neither a capital asset nor property described in subsection (j).

(2) SUBSECTION APPLICABLE ONLY TO SALES OR EXCHANGES OF DEPRECIABLE PROPERTY.—This subsection shall apply only in the case of a sale or exchange of property by a transferor which in the hands of the transferee is property of a character which is subject to the allowance for depreciation provided in section 23(1).

[14] See Summary of The Provisions of The Revenue Act of 1951 (H.R. 4473) As Agreed To by The Conferees, 82d Cong., 1st Sess., pp. 35–36, and 1 Seidman, Legislative History of Federal Income and Excess Profits Tax Laws (1953–1939) 1870. See also H. Rept. No. 586, 82d Cong., 1st Sess. (1951), p. 26, and S. Rept. No. 737, 82d Cong., 1st Sess. (1951), p. 69.

Section 328 of the bill denies tax benefits available under existing law in certain cases where depreciable assets are sold by a taxpayer to his spouse or to a corporation controlled by him. The following is an example of the tax benefits in the case of the sale of depreciable property by a taxpayer to a controlled corporation: Assume that a taxpayer owns and operates a corporation engaged in retail trade, that he also owns as an individual the building used by this corporation and that the current value of the building is well in excess of its adjusted basis. If the building is sold to the corporation, a capital-gains tax will ordinarily be paid, but the building then has, in the hands of the corporation, an adjusted basis which is greater than the basis in the hands of the individual shareholder by the amount of the gain realized on the sale to the corporation. The property being depreciable the corporation will then be able to write off the increase in the adjusted basis over the remaining life of the building. The resulting additional depreciation charges are an offset to ordinary income. Thus, in effect, the immediate payment of a capital-gains tax has been substituted for the elimination, over a period of years, of the corporate income taxes on an equivalent amount. The differential between the capital-gains rate and the ordinary rates makes such a substitution advantageous when the sale may be carried out without loss of control over the asset because the corporation to which the asset is sold is controlled by the individual who made the sale.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Section 328 of this bill eliminates the tax advantage from such transactions by denying capital-gains treatment to the transferor with respect to sales or exchanges of depreciable property between a husband and wife, or between an individual and a corporation more than 80 percent of the outstanding stock of which is owned by the individual, his spouse and his minor children or minor grandchildren.

The above passage clearly indicates that section 117(o) was intended by Congress to apply where the recognition of gain on the sale or exchange of depreciable property to a controlled corporation resulted in an increased basis on that property, which would then create higher depreciation deductions to offset ordinary income. Under section 113(a) (8)[15] the gain recognized to the petitioner will increase the basis of the property in the hands of the new corporation. Thus, we hold such gain is to be treated as ordinary income to petitioner under section 117(o) insofar as it is attributable to the depreciable element of the property transferred.

---

[15] SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.

(a) BASIS (UNADJUSTED) OF PROPERTY.—The basis of property shall be the cost of such property; except that—

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(8) PROPERTY ACQUIRED BY ISSUANCE OF STOCK OR AS PAID-IN SURPLUS.—If the property was acquired after December 31, 1920, by a corporation—

(A) by the issuance of its stock or securities in connection with a transaction described in section 112(b)(5) (including, also, cases where part of the consideration for the transfer of such property to the corporation was property or money, in addition to such stock or securities), \* \* \*

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made.

Here the total gain recognized is $159,849.15 but that gain must now be allocated between the building and the land since the land is clearly not depreciable and had been held by petitioner for more than 6 months and therefore any gain attributable to its exchange must be considered as long-term capital gain to petitioner.

Petitioner's bases are stipulated to be $65,356.58 for the building and $21,858.28 for the land. Fair market values at the time of the exchange were $290,000 and $30,000, respectively; therefore, petitioner's total potential gains were $224,643.42 and $8,141.72, respectively, if the entire difference between base and fair market value ($320,000 − $87,214.86 = $232,785.14) were to be recognized. Since only $159,849.15 of this gain is being recognized, that figure must be allocated between building and land in the same ratio as the total potential gain. The equations are:

$$\text{Land—} \$8,141.72 \; : \; \$232,785.14 \; : : \; X \; : \; \$159,849.15$$
$$X = \$5,590.77$$
$$\text{Building—} \$224,643.42 \; : \; \$232,785.14 \; : : \; X \; : \; \$159,849.15$$
$$X = \$154,258.38$$

Since $154,258.38 of the total recognized gain to petitioner is thus allocated to depreciable property (the building) it is therefore ordinary income to petitioner under section 117(o) and the remainder of the recognized gain ($5,590.77) is accorded long-term capital gains treatment.

4. Under section 113(a)(8) the basis of the property in the hands of the new corporation is petitioner's basis in the transferred property, increased in the amount of gain recognized to him. It is therefore proper to make the same allocations between building and land as in the case of the petitioner, and the respective bases of the new corporation are $219,614.96 for the building and $27,449.05 for the land.

Our holdings on the above primary issues are dispositive of the entire case; therefore, alternative positions are not discussed. Because of concessions of the parties,

*Decisions will be entered under Rule 50.*

Reviewed by the Court.

DRENNEN, *J.*, concurs in the result.

———

PIERCE, *J.*, dissenting: I believe that the Court should have decided this case on the ground that petitioner did not sustain the burden of proof imposed upon him by section 112(k) of the 1939 Code, i.e.: The burden of proving "by the clear preponderance of the evidence" that his principal purpose in entering into the trans-

actions here involved, *was not* "to avoid Federal income tax," *and was* "a bona fide business purpose." [1]

I believe also, that it is extremely doubtful whether, as a matter of law, the Court was warranted in "splitting" into two portions, the gain which petitioner realized from the single transfer of an apartment property in exchange for shares of corporate stock; and in then holding, that as to one of such portions no gain shall be recognized under sections 112(b)(5) and 112(k), but that as to the other portion gain will be recognized and taxed. In my view, such treatment defeats the intent of section 112(k), that its benefits shall be available if the taxpayer can sustain the statutory burden of proof imposed upon him (and here the Court has concluded that such burden was sustained). Also, such holding appears to me to be a "stretching" of the statute to attain an equitable result—which I think is not a judicial function.

For both these reasons, I respectfully dissent.

1. The legislative history of section 112(k)[2] indicates that Congress, in enacting this new subsection, had two objectives. First, as is shown in the committee reports, it was dealing with "bona fide business reorganizations," and also with the long-established policy in our income tax law to give due consideration to "the exigencies of business" in connection with such reorganizations by postponing, in certain specifically described instances, the recognition of gain realized "in such transactions." It was concerned that the decision of the Supreme Court in *United States* v. *Hendler*, 303 U.S. 564, might frustrate such established policy and largely nullify the provisions of existing law, in situations where "a taxpayer's liabilities are assumed by another party in what is otherwise a tax-free reorganization." The remedying of such situation was the primary purpose of the new enactment.

Secondly, as said reports further show, Congress was concerned that its attempt to prevent hardship to taxpayers in "bona fide business reorganizations," might open the door to tax avoidance in other situations where there was not "a bona fide business purpose." Thus, it provided an exception, in subsection (k), to the effect that—

if, taking into consideration the nature of the liability and the circumstances in the light of which the arrangement for the [transferee's] assumption or

---

[1] The mere fact that the Court's contrary conclusion is included in its Findings of Fact, is not sufficient to immunize such conclusion from expressions of dissent or from appellate review. Such conclusion is neither a finding of primary fact nor a finding as to veracity; rather it is a conclusion of law which involves determinations regarding the intent of the statute, the meaning of the term "business purpose," and the legal effect and sufficiency of the purposes upon which petitioner relies to sustain his statutory burden of proof.

[2] See H. Rept. No. 855, 76th Cong., 1st Sess., pp. 4–5 and 18–19; and S. Rept. No. 648, 76th Cong., 1st Sess., pp. 2–3.

acquisition [of the taxpayer's liability] was made, it appears that the principal purpose of the taxpayer with respect to the assumption or acquisition was a purpose to avoid Federal income tax on the exchange, or, if not such purpose, was not a bona fide business purpose, * * *

then, in such circumstance, the benefits of subsection (k) would not be available. It further provided specifically, that the taxpayer's burden of proving that *tax avoidance was not* his principal purpose, or of proving the existence of *a bona fide business purpose*, "shall not be considered as sustained unless the taxpayer sustains such burden by the clear preponderance of the evidence." [3]

2. It seems evident from the foregoing history of section 112(k), that the "business purpose" which is required to be established as a condition precedent to the application of said subsection, was intended to be a purpose germane to the continued conduct of the *particular business* involved in the tax-free reorganization of such business—as distinguished from other business plans of the taxpayer, or plans pertaining to his personal investment program, his family, or his estate.

This conclusion finds further support in the history of the "business purpose" concept. Such concept appears to have had its origin in the opinions of the Court of Appeals for the Second Circuit, and of the Supreme Court, in *Helvering* v. *Gregory*, 69 F. 2d 809, affd. 293 U.S. 465. This case involved an attempt by a taxpayer to obtain the benefits of a tax-free "reorganization" under section 112 of the Revenue Act of 1928—which section is cognate to section 112 of the 1939 Code with which we are here concerned. Judge Learned Hand, in speaking for the Second Circuit in such case, said:

But the underlying presupposition [of the statute] is plain that the readjustment shall be undertaken for reasons *germane to the conduct of the venture at hand,* not as an ephemeral incident, egregious to its prosecution. To dodge the shareholders' taxes is not one of the transactions contemplated as corporate "reorganizations."

\* \* \* \* \* \* \*

All these steps [taken by the taxpayer therein] were real, and their only defect was that they were not what the statute means by a "reorganization," because the transactions were *no part of the conduct of the business of either or both companies,* * * * [Emphasis supplied.]

Similarly, the Supreme Court in its opinion in the *Gregory* case, said:

When subdivision (B) speaks of a transfer of assets by one corporation to another, it means a transfer made "in pursuance of a plan of reorganization" (section 112(g)) of corporate business; and not a transfer of assets by one

---

[3] Other statutory provisions in which Congress has provided for the denial of income tax benefits in connection with transactions that are motivated by purposes of tax avoidance, include section 129 of the 1939 Code and section 269 of the 1954 Code (pertaining to acquisition made to evade or avoid income tax), and section 15(c) of the 1939 Code and section 1551 of the 1954 Code (pertaining to disallowance of surtax exemption and accumulated earnings credit).

corporation to another in pursuance of a plan *having no relation to the business* of either, as plainly is the case here. Putting aside, then, the question of motive in respect of taxation altogether, and fixing the character of the proceeding by what actually occurred, what do we find? Simply an operation having *no business or corporate purpose*—a mere device which put on the form of a corporate reorganization as a disguise for concealing its real character, and the sole object and accomplishment of which was the consummation of a preconceived plan, [which was] *not to reorganize a business or any part of a business,* * * * [Emphasis supplied.]

3. Turning now to the facts of the instant case, and giving particular attention to the two factors which section 112(k) provides shall be taken into consideration (i.e.: The nature of the liability; and the circumstances in the light of the arrangement for the new corporation to take over the encumbered property subject to such liability), it appears clear that neither petitioner's creation of the $250,000 mortgage liability, nor his arrangement for the transfer of the encumbered apartment property to his new wholly owned corporation subject to said liability, was motivated by any bona fide purpose germane to the business of continuing the operation of the apartment.

What happened here, according to the Court's Findings of Fact, was this. At the beginning of the year 1952, the petitioner individually owned and operated an apartment building. He had acquired this property in the preceding year, through liquidation of a prior corporation of which he was beneficial owner of all its stock; and, in effecting such liquidation, he had "sought and received tax advice on how to proceed so as to incur the least amount of tax liability."

On March 25, 1952, petitioner encumbered this apartment house property with a $200,000 mortgage; and, a few months later, on June 19, 1952, he increased the amount of the mortgage on said property to the amount of $250,000. In taking such action, he again received advice. His purported reason for creating this large liability was to facilitate sale of the property; but he refused opportunities to dispose of the same for other than cash. He was aware that the property had appreciated in value (its fair market value was then about $320,000). And, since he had recently acquired the property through liquidation of the prior corporation and he had received tax advice in connection therewith, it is reasonable to assume in the absence of contrary evidence, that he also knew that his basis for such property was only about $87,000; and that any cash sale thereof would give rise to a very substantial amount of income tax. On the other hand, the placing of the mortgage would permit him to obtain tax free and in cash, approximately five-sixths of the

appreciated value of the property; although he would still be personally liable for repayment.

Upon receiving the $250,000 proceeds from the mortgage, petitioner invested the same in United States Government 90-day bills and at the time of the trial herein, he still personally maintained such investments. Notwithstanding his above-mentioned statutory burden of proof, he presented no evidence that any portion of such mortgage proceeds was applied toward improvement of the apartment property; or that his purpose in creating this large indebtedness was in any way related to the business of operating such property.

Thereafter, in October of the same year 1952, he organized a new corporation; and, in exchange for all its shares of capital stock, he transferred the apartment property to such corporation, subject to the large mortgage debt for which he was personally liable.

The effects of the aforesaid transactions, considered entirely apart from his motives or purposes, were as follows: (1) He, as before stated, obtained tax free and in cash, about five-sixths of the appreciated value of the apartment property, although he was still personally liable for repayment—and the proceeds approximated the amount after income taxes, which he could have realized from a cash sale of the property; (2) he also obtained all of the stock of the new corporation—which represented, in substance, his net equity in the property transferred; (3) any earnings and profits derived by the new corporation could thereafter be applied by it toward removing the mortgage encumbrance on its property—thereby eliminating the necessity for it to issue taxable dividends to petitioner; (4) if the corporation did apply its earnings toward clearing the mortgage, petitioner's shares of stock therein would be likely to appreciate in value; and (5) if petitioner sold his shares of stock, his basis for computing gain on such sale would not (as is shown in the Court's Opinion herein) reflect a basis decrease equal to the full amount of the mortgage—so that part of his actual realized gain would never (unless the Court's method of splitting the gain is valid) be subjected to income tax.

I think that this is the precise type of situation which Congress intended to eliminate, by expressly imposing the heavy burden of proof on the taxpayer, in respect of absence of a principal purpose "to avoid Federal income tax," and the presence of "a bona fide business purpose."

4. This Court, in the majority Opinion herein, has made reference to five purposes of the petitioner for entry into the transactions here involved; and the Court has concluded that such purposes are suf-

ficient to sustain "by the clear preponderance of the evidence" the burden of proof imposed upon petitioner by section 112(k). I think, however, that such purposes (whether considered singularly or collectively) are not sufficient to establish, either the absence of a tax-avoidance purpose, or the presence of a bona fide business purpose; and that each of such purposes is wholly unrelated to the continued business of operating the apartment property. These purposes mentioned by the Court, are:

(1) Petitioner's desire, in creating the large mortgage indebtedness, and in neither paying off the same prior to the transfer of the property to the new corporation nor transferring the proceeds to such corporation, was to personally achieve and "remain in an extremely liquid financial position"—so that he would be able to take advantage of quick investment opportunities in the event "of what he thought was an imminent break in the general price structure of investments."

(2) He desired the limited liability afforded by the corporate shield. This of course affected him only in his personal capacity as a stockholder of the new corporation.

(3) He thought that transfer of the property to the new corporation would make it easier for him, as an officer or employee, to turn the management over to some outside party, "if he should decide to live elsewhere." (This was not only a personal reason, but also it involved an indefinite possibility concerning the affairs of him and his family, which in fact did not occur.)

(4) He was experiencing marital difficulties, and he wished to "exempt it [the apartment property] from potential marital claims."

(5) He wished "to have the property in corporate form in order to facilitate its division among his heirs-to-be."

In my view, said purposes not only fail to establish "by the clear preponderance of the evidence," the absence of a purpose "to avoid Federal income tax" and the existence of "a bona fide business purpose"; but they actually establish the contrary. I would have decided this case on the basis that the petitioner did not sustain the burden of proof imposed upon him by section 112(k).

ATKINS and MULRONEY, *JJ.*, agree with this dissent.