W. H. B. SIMPSON AND KATHERINE M. SIMPSON, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1245–63, 2169–63. Filed March 30, 1965.

*Joseph E. McAndrews* and *Thomas A. Frazier, Jr.*, for the petitioners.

*Winfield A. Gartner*, for the respondent.

DRENNEN, *Judge:* In these consolidated proceedings respondent determined deficiencies in petitioners' income tax for the taxable years 1958 and 1959 in the respective amounts of $233,532.55 and $231,899.97.

The only issue for decision is whether petitioners realized long-term capital gain in the amount of $908,697.95 [1] upon the transfer of stocks, securities, and other property to Collins-Crain Co. (hereafter referred to as Collins-Crain) upon its incorporation in a transaction by which Collins-Crain issued 498 of its 500 shares of outstanding stock to petitioner W. H. B. Simpson and assumed liabilities to which the stocks,

---

[1] Respondent originally determined that petitioners' gain to be recognized upon the exchange was in the amount of $940,119.52. The above amount reflects respondent's concession in the stipulation of facts.

securities, and other property were subject at the time of the transfer.

Because of uncertainties as to when the transfers took place, respondent determined that petitioner W. H. B. Simpson realized a gain on the transaction in both the years 1958 and 1959, but concedes that the gain should be taxed in one year or the other but not both.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners are husband and wife, residing in Greenville, S.C. They filed joint Federal income tax returns for the taxable years 1958 and 1959 with the district director of internal revenue, Columbia, S.C. Hereafter, W. H. B. Simpson will be referred to as petitioner.

Petitioner is a successful retailer with a substantial interest in the outstanding stock of 29 corporations comprising the Belk-Simpson department store chain which operates a number of department stores, principally in the Southeast. During the periods in issue, petitioner was an executive officer in, and received salaries, dividends, and director's fees in substantial amounts from, these corporations.

At an early age petitioner became associated with W. H. Belk, Sr., the founder and owner of the Belk chain of department stores throughout the South. In 1929 petitioner was given the opportunity to purchase a Belk store which had been losing money, by assuming its indebtedness. Petitioner did so, and moved the store to Greenville, S.C., where he operated it under the name "Greenville Bargain House." The store was successful in Greenville under petitioner's management, and petitioner was given the further opportunity to open additional Belk stores and accept a minority stock interest in the corporations which operated the stores. These stores became the Belk-Simpson chain.

In 1932 petitioner incorporated the Greenville Bargain House, becoming the owner of over 80 percent of the stock of the corporation. W. H. Belk, Sr., later bought some of the stock of Greenville Bargain House, but petitioner remained the majority stockholder and controlled the policies of the corporation. Greenville Bargain House continued to be successful, and petitioner followed a policy of investing surplus funds of the corporation in stocks and securities (hereafter referred to collectively as securities). He considered that it was good business to have the funds of Greenville Bargain House invested in the stock of mills and other suppliers because it could buy merchandise from these suppliers at bargain prices which would not have been available to the corporation without owning stock in the suppliers. He also believed that it was important for the corporation to own marketable securities that could be used by the corporation as collateral to obtain bank loans when the corporation needed working capital or funds for expansion, without the personal endorsements of its stock-

holders. He found that the appreciation in value of the securities, plus dividends and interest received from them, generally exceeded interest charges on loans which were secured by the securities. Petitioner also considered that it was good business for Greenville Bargain House to purchase stock of banks with which it dealt in borrowing money.

Petitioner also felt that it was advisable for the Belk-Simpson stores, in which he held a minority interest, to purchase securities with excess funds. W. H. Belk, Sr., concurred in petitioner's views and, during the lifetime of W. H. Belk, Sr., this policy of investing funds in the stocks of banks, suppliers, and other corporations was followed by the Belk-Simpson corporations.

During 1954 Greenville Bargain House purchased five branch stores at a cost of over $730,000. Despite the fact that the corporation then owned securities having a total cost of over $600,000 and a market value in excess of that amount, these branch store purchases were financed with borrowed funds, the securities owned by the corporation being used as collateral for the loans.

As of December 31, 1954, Greenville Bargain House was merged into and with the Belk-Simpson Co. of Greenville, S.C. (hereafter referred to as Belk-Simpson, Greenville), and petitioner became a substantial, although minority, stockholder in the surviving corporation. At this time much of the net worth of Greenville Bargain House was reflected in the securities owned by it, and their market value made the merger attractive to the Belk interests.

From the time he first began in business petitioner made it a practice to invest his own funds in securities, not only of the Belk-Simpson corporations but also of local corporations with which he was familiar, as well as publicly held corporations. He often purchased securities with borrowed funds, and he borrowed money from various banks throughout North Carolina, South Carolina, Georgia, and Florida to finance his purchases. Also, he often used securities which he owned as collateral for loans, the proceeds of which he used for loans to Belk-Simpson corporations for working capital. Petitioner was quite successful in his choice of investments.

In February 1952, petitioner's longtime associate, W. H. Belk, Sr., died. His interests in the Belk-Simpson corporations were inherited by his surviving widow and his six children, one of whom was W. H. Belk, Jr., who became president of most of the Belk corporations. Personality and policy differences arose among the Belk children and Belk, Jr., was gradually removed from the presidency of many of the Belk corporations. Petitioner, realizing that he was not a controlling stockholder in any of the Belk-Simpson corporations, became somewhat apprehensive about his own position in these companies and

particularly about the influence he could exert on management policies of the corporations.

By 1956 serious differences among the directors of Belk-Simpson, Greenville, developed, particularly in regard to financial matters. Petitioner urged that the corporation continue to follow the policy of borrowing funds to meet corporate needs, using the stocks and securities owned by it as collateral for the loans. However, a majority of the directors disagreed and at a meeting on May 7, 1956, adopted a resolution empowering and directing the officers of Belk-Simpson, Greenville, "to sell, for fair market value, all of the stocks and securities or real estate owned by this corporation, which are not related to the principal business of the corporation, namely the mercantile business, said sale and liquidation to be accomplished in an orderly manner so as not to sacrifice said securities or depress the market price." At this meeting of the board, the directors voted on three motions; petitioner's vote was in the minority on each.

Petitioner did not comply literally with this action of the directors and at the annual meeting of the stockholders of Belk-Simpson, Greenville, in 1957, petitioner pointed out that had he complied literally with such resolutions adopted in the past by the directors, the financial stability of the corporation would have been endangered and a loss of $100,000 would have been sustained on the sale of one particular block of stock. But despite this statement, the disagreement over the financial policies of the company persisted and the corporate bylaws were amended to reserve to the stockholders control of the purchase and sale of stocks and securities by the corporation.

Petitioner, finding himself in disagreement with the majority of the directors of the Belk-Simpson corporations, decided to enter a business which would be independent of the Belk interests. He had a substantial net worth at the time, with his principal assets being stocks and securities, and this net worth made feasible his investment in a business without the necessity of seeking financing from the Belk interests. Petitioner felt he should enter the retail dry goods business since he was experienced in this business, and he anticipated that he could make a success of a business which he independently controlled, as he had the Greenville Bargain House prior to its merger, when he relinquished control.

Petitioner was well aware that most of the dividends he received from his stocks were includable in his gross income, subject to tax at high rates as ordinary income. He also knew that dividends received by a corporation were includable in its income only to the extent of 15 percent because of the dividends-received credit available to a corporation, and he was aware of corporate income tax rates.

In 1957 petitioner consulted a lawyer in Greenville, S.C., named Dobson, who specialized in tax matters, about forming a corporation which petitioner would control to enter the retail dry goods business. Petitioner knew that Dobson was well acquainted and thought he might know of a business which petitioner might acquire. Petitioner also discussed with Dobson the feasibility of transferring some of the securities he owned to such a corporation to be used as working capital and for possible future expansion.

Dobson considered the income tax effects of petitioner's transfer of stocks and securities to a corporation which would be controlled by petitioner immediately after the transfer. Dobson concluded that petitioner could transfer properties, including securities, to a new corporation in exchange for its stock in a transaction that would qualify as a tax-free exchange under section 351, I.R.C. 1954,[2] and he also concluded that there were several tax advantages to be gained by petitioner's transferring securities to the new corporation. He also realized that if the corporation received a large amount of dividend income it might be subjected to the accumulated earnings tax under section 531 unless its earnings were distributed, and that it might qualify as a personal holding company under section 542 unless its gross income from other sources was substantial. He concluded that the latter problem would be solved if the corporation's income from the mercantile business was sufficient. With reference to the first problem, Dobson concluded that if it could be arranged for the corporation to have liabilities, from the date of incorporation, which would be discharged out of its net earnings, it would be insulated from the accumulated earnings tax for a while. Inasmuch as a large part of the securities owned by petitioner at the time were pledged as collateral for bank loans to petitioner and as security for petitioner's margin accounts with stockbrokers, Dobson felt that a transfer of these securities to the corporation, with the corporation assuming the indebtedness, would be a solution to this problem.

But Dobson's proposed solution raised another problem: If petitioner transferred his stocks and securities in the newly formed corporation in exchange for stock and assumption of the liabilities, care would have to be taken that the liabilities assumed did not exceed petitioner's basis in the assets transferred to the corporation, since Dobson was aware that any excess of such liabilities over petitioner's basis would give rise to recognition of gain to petitioner by virtue of the provisions of section 357(c). Dobson gave no consideration to the provisions of section 357(b).

Dobson's consideration of the problems extended over a period of time. He requested that petitioner give him a net worth statement

---

[2] All section references are to the Internal Revenue Code of 1954 unless otherwise indicated.

and a list of petitioner's securities which he could study prior to advising petitioner what securities should be transferred to the new corporation. Petitioner told him that he did not want to transfer worthless or low-yield stocks to the corporation because that would defeat his purpose of providing the new corporation with income-producing stocks that could be used to produce working capital and finance future expansion.

Petitioner retained a firm of certified public accountants to prepare his Federal income tax returns and he requested this firm to prepare a net worth statement for him together with a list of his securities and their bases and fair market values. This information was given to Dobson in early 1958. At no time did petitioner discuss with his accountants any methods for the minimization of income taxes, and he did not consult with them as to the formation of a controlled corporation.

The net worth statement prepared by petitioner's accountant as of November 30, 1957, reflected petitioner's net worth as follows:

### ASSETS

Current assets:

| | | |
|---|---:|---:|
| Cash in hands [sic] | $55,976.67 | |
| Loans receivable (payable on demand) | 41,859.68 | |
| Marketable securities—predominantly those listed on stock exchange—valued at market value | 2,260,077.89 | |
| Marketable securities held by stockholders on margin accounts | 521,667.75 | |
| Stock in various Belk-Simpson stores (book value at Dec. 31, 1956) | 1,378,040.20 | |
| Total current assets | | $4,257,622.19 |
| Real estate | | 94,445.00 |
| Automobiles | | 20,000.00 |
| Total assets | | 4,372,067.19 |

### LIABILITIES AND NET WORTH

Current liabilities:

| | | |
|---|---:|---:|
| Due to stockbrokers (secured by securities above) | $289,780.24 | |
| Due to various banks—payable on demand (secured by stocks) | 1,234,780.02 | |
| Due to relatives and Belk-Simpson stores (payable on demand) | 253,349.67 | |
| Estimated income taxes | 50,000.00 | |
| Total liabilities | | $1,827,909.93 |
| Net worth | | 2,544,157.26 |
| | | 4,372,067.19 |

NOTE: Contingent liabilities on which there is a liability as endorser of various notes amount to approximately $1,500,000.

Petitioner's net worth, except for about $30,000–$40,000 which he inherited, had been built up from his earnings, dividends, and gains on investments.

Of the approximately $2,780,000 in market value of marketable securities owned by petitioner, approximately $520,000 in value were held by stockbrokers in margin accounts securing liabilities of approximately $290,000. All or most of the remainder of these securities were pledged as collateral to secure petitioner's bank loans totaling approximately $1,235,000.

On or about this time petitioner and Dobson began looking for a retail dry goods business which petitioner could purchase. After looking at several businesses, which were not suitable for one reason or another, they contacted Roy E. Collins, Jr., who, together with his mother and father, owned the stock of Bailes-Collins Co., a corporation operating a department store in Greer, S.C. Collins, Sr., was also a stockholder with Hugh T. Crain in Bailes-Collins & Crain Co., a corporation operating a department store in Inman, S.C.

Dobson and petitioner began negotiations with Collins, Jr., and with Crain for the purchase of the stock of the two corporations with the idea that petitioner's newly formed corporation would operate the two department stores, with Collins, Jr., and Crain as the managers thereof. By an agreement dated October 21, 1958, petitioner agreed to purchase the stock of Bailes-Collins Co. and of Bailes-Collins & Crain Co., at a cost reflecting book value of the stock, with certain adjustments. Petitioner agreed to liquidate the corporations after purchase and to transfer the assets of the corporations to a new corporation to be known as Collins-Crain Co. to be formed by petitioner. Collins-Crain was to operate the two department stores and to employ Collins and Crain as managers at stipulated salaries, plus percentage bonuses. Collins-Crain was to operate the stores "promptly after January 1, 1959." Dobson was made a party to the agreement and agreed to act as petitioner's agent in purchasing the stock and liquidating the corporations. Collins was particularly anxious to become associated in business with petitioner because he considered sufficient working capital to be important to a department store business and he knew that petitioner's net worth would permit him to supply necessary capital for the business. Petitioner was glad to obtain the services of Collins because he considered that Collins was young, aggressive, and able.

Dobson was to act as petitioner's agent in the transactions and as petitioner's nominee in holding the stock of the new corporation because petitioner did not want it known that he was entering into a business which might be competitive with stores owned by the Belk interests.

Collins-Crain Co. was incorporated under the laws of South Carolina on October 29, 1958, with an authorized capital stock of $100,000 represented by 1,000 shares of $100 par value stock. Except for one qualifying share, the stock of Collins-Crain was initially issued in the name of Dobson.

On November 19, 1958, petitioner transferred to Collins-Crain securities pledged to the Citizens & Southern National Bank of Greenville to secure a liability of petitioner to that bank having a balance then due of $330,069.74. Petitioner's total basis in these securities was $330,804.90, but the total fair market value thereof on the date of transfer was $911,769.11. Other securities owned by petitioner and pledged to secure this loan were not transferred to Collins-Crain and were also removed as collateral for the loan. Collins-Crain assumed payment of the liability to the bank. The loan policy of this bank at this time was to loan up to 60 percent of the fair market value of listed securities and up to 50 percent of the fair market value of unlisted securities. This indebtedness, originally in the amount of $336,000 was evidenced by a demand note executed by petitioner bearing interest at $4\frac{1}{2}$ percent, and had been incurred by petitioner in December 1957. The proceeds of the loan had been used by petitioner to repay loans and interest to banks, brokers, and others, to loan money to a Belk-Simpson store and others, and to purchase securities and pay other obligations of petitioner.

As of November 26, 1958, petitioner was indebted to the South Carolina National Bank on two loans, one in the amount of $220,000 and the other in the amount of $80,000, both of which were secured by securities owned by petitioner and pledged as collateral for the loans. The $220,000 was the balance due on a loan of $230,000 made by the bank to petitioner on August 18, 1955, evidenced by a demand note executed by petitioner bearing interest at the rate of $3\frac{3}{4}$ percent, the proceeds of which were used primarily to repay loans and interest to banks, Belk corporations, and others, and to purchase securities and make payments on his margin accounts.

On November 26, 1958, petitioner transferred to Collins-Crain securities pledged to the South Carolina National Bank as collateral for the loan in the amount of $220,000 in which petitioner had a basis of $220,168.28 but which had a fair market value as of that date of $422,092.23, and Collins-Crain assumed payment of petitioner's liability to the bank in the amount of $220,000. The securities transferred remained pledged as collateral for the indebtedness, but other securities which had been pledged to secure this loan and the $80,000 loan were not transferred to Collins-Crain, and the corporation did not assume the $80,000 liability to the bank. In determining just which securities were to be transferred it was necessary for petitioner, with

the advice of Dobson, to rearrange the collateral securing the two loans. The securities which were removed as collateral for the $220,000 debt were pledged as additional collateral for the $80,000 debt, and were also hypothecated by petitioner as collateral for the $220,000 debt.

In December 1958, petitioner maintained three accounts with Thomson & McKimon, stockbrokers; a margin account, a special subscription account, and an investment account. On December 19, 1958, as the result of certain transfers among the several accounts, the total indebtedness due from petitioner on the margin account and the special subscription account was $197,512.18, against which were pledged various securities owned by petitioner, having a basis in petitioner's hands of $198,553.47 and a fair market value on that date of $383,933.74. On December 19, 1958, petitioner transferred those securities to Collins-Crain subject to the liability and Collins-Crain assumed payment of the indebtedness in the amount of $197,512.18. As of December 31, 1958, as the result of the various debits and credits to and between the various accounts and as a result of the transfer, petitioner's margin and subscription accounts had zero balances, any excess in these accounts over the margin requirements having been transferred to petitioner's investment account.

As a result of the three transfers last above mentioned, Collins-Crain received from petitioner securities having a total fair market value on the dates of transfer of $1,717,795.08 but which had an aggregate basis in petitioner's hands of $749,526.65, and assumed liabilities for which these securities were pledged as collateral in the aggregate amount of $747,581.92.

In November 1958, the total cost basis and fair market value of petitioner's securities, including those subject to liabilities and those free of liabilities, were such that petitioner could have sold securities (other than stock of Belk and Belk-Simpson corporations, and other than Seaboard Airline RR. Co. stock in which petitioner had large unrealized gains) for $866,540.34; realized a capital loss for tax purposes in the amount of $1,665.55; paid off all liabilities to which his securities were subject; and still have transferred to Collins-Crain securities having a fair market value of $1,195,988.10, free of all liabilities.

On January 1, 1959, Dobson, as agent for petitioner, purchased the stock of Bailes-Collins Co. for a total of $136,049.67, payable $27,209.94 upon execution of the agreement with the balance payable in four yearly installments represented by notes in the amounts of $27,209.93, $27,209.93, $27,209.93, and $27,209.94, due January 1, 1960, 1961, 1962, and 1963, respectively.

Also on January 1, 1959, Dobson, as agent for petitioner, purchased the stock of Bailes-Collins & Crain Co. for $114,426.95, payable $22,885.39 upon execution of the contract with the balance payable

in four yearly installments represented by notes, each in the amount of $22,885.39, due January 1, 1960, 1961, 1962, and 1963.

Thereupon, as of January 1, 1959, the two corporations were liquidated. Thereafter the assets and liabilities of the two corporations, except as hereinafter noted, were transferred by petitioner to Collins-Crain.

The total purchase price of the stock of the two corporations was $250,476.62. The two downpayments, totaling $50,095.33, were satisfied by petitioner from assets received by him upon the liquidation of the two corporations, being a note receivable due from the seller-stockholder in the amount of $28,750 which was canceled, an account receivable in the amount of $600 which was assigned to the seller-stockholder, and cash on hand in the purchased corporations in the amount of $20,745.33. The balance of the purchase price, in the amount of $200,381.29, was paid as follows: Notes dated January 1, 1959, in the face amount of $50,095.33, bearing interest at 5 percent, due January 1, 1963, were executed by petitioner and Dobson and issued to the sellers; notes in the aggregate amounts of $150,285.98, also dated January 1, 1959, and due January 1, 1960, through January 1, 1963, with interest at 5 percent, were executed by Collins-Crain and issued to the sellers. This liability of $150,285.98 [3] was carried as a liability on the books of Collins-Crain.

On January 1, 1959, Bailes-Collins Co. and Bailes-Collins & Crain Co. had total cash on hand in the amount of $101,315.66. Of this total, the amount of $20,745.33 was disbursed to selling stockholders as noted above; the amount of $31,421.07 was used to discharge certain liabilities of the acquired corporations; the amount of $39,000 was transferred to Collins-Crain; and the amount of $10,149.26 was retained by Dobson and subsequently disposed of by order of a local court. All other assets of the acquired corporations were transferred to Collins-Crain and used in operation of the two department stores.

The basis of the total assets of the acquired corporations transferred to Collins-Crain was $211,211.34, computed as follows: [4]

| | |
|---|---:|
| Petitioner's basis of stock purchased | $250,476.62 |
| Liabilities assumed on liquidation: | |
| Amount retained by Dobson to cover liabilities | 10,436.57 |
| Accrued payroll taxes | 393.48 |
| | 261,306.67 |
| Less: Cash and assets not transferred | 50,095.33 |
| | 211,211.34 |

[3] Total amount of notes as finally executed differ in an immaterial amount from that called for in the purchase agreement.

[4] Apparently, upon liquidation of the corporations, petitioner assumed their unpaid liabilities. Collins-Crain in turn assumed them. The amount retained by Dobson was to cover contingent liabilities and there is some doubt that this amount should be added to basis. In view of our holding, the point is immaterial.

At the conclusion of all of the above transfers, petitioner had transferred to Collins-Crain assets (including the securities and the assets of the two liquidated corporations) having an aggregate basis in his hands of $960,737.99 (from above figures); and Collins-Crain had assumed liabilities totaling $908,697.95 ($747,581.92 due to the banks and the broker, $150,285.98 due on the notes to the former owners of the two corporations, and $10,830.05 due on the liabilities of the two stores).

Journal entries were made to record the foregoing transfers of stocks, cash, and assets to Collins-Crain. The stocks and other assets were shown on the books of Collins-Crain at their bases to petitioner. Liabilities assumed, including the notes to the sellers of stock of the two acquired corporations, were recorded. The excess of basis of property, plus cash, over liabilities was credited to capital stock and to capital surplus.

On January 1, 1959, 450 shares of stock of Collins-Crain were issued to Dobson, and all but 1 of the shares previously issued to Dobson were canceled. The remaining two outstanding shares were transferred to Roy E. Collins, Jr., and Hugh T. Crain.

On January 7, 1959, 249 shares of stock of the Collins-Crain Co. were issued to Dobson, trustee for Katherine McArver Simpson and Mary Elizabeth Simpson, and on the same date, 249 shares of the stock of the Collins-Crain Co. were issued to Dobson, trustee for Katherine McArver Simpson and Lucy B. Simpson. On the same date the 450 shares previously issued to Dobson were canceled. As of January 7, 1959, there were 500 shares of stock of Collins-Crain Co. outstanding, each of which was stated to have a par value of $100; and 498 of such shares were issued in the name of Dobson, trustee, and 1 share each was held by Roy E. Collins, Jr., and Hugh T. Crain.

At some date shortly before October 1960 petitioner discovered for the first time that Dobson had caused 498 shares of Collins-Crain stock to be issued in his name as trustee. On October 28, 1960, petitioner filed complaints in the County Court, Greenville County, S.C., against Dobson individually and as trustee, seeking to have the alleged trusts declared null and void. An officer of the County Court conducted a hearing in the matter, at which time both Dobson and petitioner, who did not object to Dobson's testimony on the grounds of privileged communication of client-attorney relationship, testified extensively as to petitioner's motives, including those relating to Federal tax minimization, for forming Collins-Crain. In May 1961 the County Court held the purported trusts null and void *ab initio*. Petitioner became president of Collins-Crain upon termination of the litigation.

Following petitioner's litigation with Dobson, the Belk heirs discovered petitioner's interest in Collins-Crain, which was operating the

stores in Greer and Inman. They considered petitioner's interest to be in conflict with that of the Belk-Simpson chain, and the Belk children demanded that he either divest himself of an interest in competing stores or resign as an officer and director of the Belk-Simpson stores. He finally acceded to their demands and, on February 13, 1962, he entered into an agreement with five of the Belk children in which he agreed that, so long as he remained a director or officer in any of the Belk corporations, he would not participate (as a stockholder, director, officer, or otherwise) in the ownership or operation of any mercantile store, wholesale or retail, without the prior written consent of a majority of the Belk children. He also agreed to dispose of any interest in such a competing mercantile store by July 1, 1962.

Pursuant to the agreement, petitioner caused Collins-Crain to sell the Greer store to Collins and the Inman store to Crain.

Petitioner obtained the consent of the Belk heirs to have Collins-Crain purchase a wholesale candy and notions business.

Petitioner resigned as an officer and director of the Belk and Belk-Simpson corporations in about May 1963.

From 1959 to the date of trial, Collins-Crain has been actively engaged in business, first the operation of the Greer and Inman stores and later the wholesale candy and notions business. Collins is presently a stockholder and officer in the corporation and, from 1959 to the present, petitioner and Collins have actively investigated department stores in West Virginia, Tennessee, North Carolina, South Carolina, New York, and Michigan which the corporation might purchase. However, none of the businesses investigated were purchased by Collins-Crain. Petitioner did open a department store in Murphy, N.C., but this store was owned and operated by a separate corporation of which petitioner individually owned a major portion of the outstanding stock. While Collins-Crain did not own any of the stock of the Murphy corporation, the store opened by that corporation was largely financed with loans from Collins-Crain. Both Collins and petitioner are hopeful that the business of the corporation can be expanded.

The name of Collins-Crain was changed to Simpson Enterprises, Inc., on December 17, 1962.

The corporation reported net income as follows for the taxable years (ended September 30) 1959–63:

| Taxable year | Net income [1] |
|---|---|
| 1959 | $25,662.54 |
| 1960 | 66,455.72 |
| 1961 | 29,314.37 |
| 1962 | (92,590.24) |
| 1963 | (36,155.94) |

[1] After dividends-received credit.

Collins-Crain owned securities as follows at September 30, 1959–63:

| At yearend | Securities (at cost) |
|---|---|
| 1959 | $690,789.35 |
| 1960 | 734,129.21 |
| 1961 | 741,513.46 |
| 1962 | 789,568.31 |
| 1963 | 904,353.91 |

Collins-Crain had liabilities (other than accounts payable and accrued expenses) as follows at September 30, 1959–63:

| At yearend | Liabilities |
|---|---|
| 1959 | $777,274.09 |
| 1960 | 677,511.79 |
| 1961 | 690,910.39 |
| 1962 | 645,877.93 |
| 1963 | 668,178.20 |

Prior to December 31, 1960, Collins-Crain had paid $125,069.74 on the indebtedness to the Citizens & Southern National Bank and had discharged the $220,000 liability with the South Carolina National Bank, but the corporation, before December 31, 1960, had incurred new bank loans in the total amount of $225,000.

ULTIMATE FINDINGS

Petitioner's principal purpose with respect to the assumption of petitioner's liabilities by Collins-Crain and with respect to the acquisition by Collins-Crain of property from petitioner subject to liabilities, in the transactions involved, was not a purpose to avoid income tax on the exchange, and was a bona fide business purpose.

OPINION

Beginning in November 1958 and concluding with the transactions on January 1, 1959, petitioner, by four successive transfers, transferred assets of two department stores and cash, which he had acquired on liquidation of the two corporations which operated the department stores, and securities, which he had owned individually, to Collins-Crain, a newly organized corporation. He received upon the exchanges 498 out of 500 shares of the issued and outstanding stock of Collins-Crain,[5] and the parties agree that the transactions

---

[5] The parties agree that the shares of Collins-Crain, issued on Jan. 7, 1959, to Dobson as trustee are to be deemed to have been issued to petitioner.

fall within the purview of section 351,[6] which provides that no gain is to be recognized upon the transfer of property solely in exchange for stock, if the transferor is in control of the corporation immediately after the exchange.

While petitioner admittedly did not actually receive any "money or other property" on the exchange, Collins-Crain did assume certain liabilities of petitioner upon the exchange and acquired property of petitioner subject to other liabilities. Respondent has determined that these liabilities must be considered as money received by petitioner on the exchange and that petitioner's gain on the exchange is to be recognized to the extent thereof. Respondent's determination and his contention herein are based upon the provisions of section 357[7] which provides rules which qualify the effect of section 351.

---

[6] SEC. 351.   TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.

(a) GENERAL RULE.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation.   For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property.

(b) RECEIPT OF PROPERTY.—If subsection (a) would apply to an exchange but for the fact that there is received, in addition to the stock or securities permitted to be received under subsection (a), other property or money then—

(1) gain (if any) to such recipient shall be recognized, but not in excess of—
(A) the amount of money received, plus
(B) the fair market value of such other property received ; * * *

[7] SEC. 357.   ASSUMPTION OF LIABILITY.

(a) GENERAL RULE.—Except as provided in subsections (b) and (c), if—

(1) the taxpayer receives property which would be permitted to be received under section 351, 361, 371, or 374 without the recognition of gain if it were the sole consideration, and

(2) as part of the consideration, another party to the exchange assumes a liability of the taxpayer, or acquires from the taxpayer property subject to a liability,

then such assumption or acquisition shall not be treated as money or other property, and shall not prevent the exchange from being within the provisions of section 351, 361, 371, or 374, as the case may be.

(b) TAX AVOIDANCE PURPOSE.—

(1) IN GENERAL.—If, taking into consideration the nature of the liability and the circumstances in the light of which the arrangement for the assumption or acquisition was made, it appears that the principal purpose of the taxpayer with respect to the assumption or acquisition described in subsection (a)—

(A) was a purpose to avoid Federal income tax on the exchange, or
(B) if not such purpose, was not a bona fide business purpose,

then such assumption or acquisition (in the total amount of the liability assumed or acquired pursuant to such exchange) shall, for purposes of section 351, 361, 371, or 374 (as the case may be), be considered as money received by the taxpayer on the exchange.

(2) BURDEN OF PROOF.—In any suit or proceeding where the burden is on the taxpayer to prove such assumption or acquisition is not to be treated as money received by the taxpayer, such burden shall not be considered as sustained unless the taxpayer sustains such burden by the clear preponderance of the evidence.

(c) LIABILITIES IN EXCESS OF BASIS.—

(1) IN GENERAL.—In the case of an exchange—

(A) to which section 351 applies, or
(B) to which section 361 applies by reason of a plan of reorganization within the meaning of section 368(a)(1)(D),

if the sum of the amount of the liabilities assumed, plus the amount of the liabilities to which the property is subject, exceeds the total of the adjusted basis of the property transferred pursuant to such exchange, then such excess shall be considered as a gain from the sale or exchange of a capital asset or of property which is not a capital asset, as the case may be.

(2) EXCEPTIONS.—Paragraph (1) shall not apply to any exchange to which—

(A) subsection (b)(1) of this section applies, or
(B) section 371 or 374 applies.

In summary, section 357 provides the general rule that, upon an exchange governed by section 351, the assumption by the transferee-corporation of the transferor-stockholder's liabilities or the acquisition by the transferee-corporation of property subject to liabilities, shall not constitute "money or other property"—that is, boot—received by the transferor-stockholder on the exchange. Thus, generally, the incorporating stockholder, such as petitioner in the instant case, will not be deemed to have realized any recognizable gain on the exchange if he transfers appreciated property subject to liabilities to a controlled corporation, and if he receives nothing upon the exchange but stock of the corporation.

Subsections 357 (b) and (c), however, provide exceptions to this general rule. Subsection (c) provides that in the case of an exchange to which section 351 applies if the sum of the liabilities assumed by the transferee, plus the liabilities to which the transferred property is subject, exceed the total adjusted basis of the property transferred, then such excess shall be considered as a gain realized and recognized on the exchange. Here it is clear that the transactions were so arranged that the liabilities assumed and to which the transferred properties were subject were less than the transferor's basis in the properties transferred in the exchange, so subsection (c) is not applicable.

But section 357(b)(1) provides that the corporation's assumption of the transferor's liabilities, or the acquisition by the corporation of property subject to liabilities, shall, for purposes of section 351, be considered as money received by the transferor-stockholder on the exchange, if it appears that the principal purpose of the "taxpayer" (the transferor), with respect to the assumption or acquisition by the corporation, was a purpose to avoid Federal income tax on the exchange, or if not such purpose, was not a bona fide business purpose. In determining the principal purpose of the taxpayer in such a situation, we are directed by the statutory provision to consider the nature of the liabilities and the circumstances in the light of which the arrangement for the assumption or acquisition was made. Furthermore, subsection (b)(2) provides that, in a situation such as the present one in which petitioner has the burden of proving that such assumption or acquisition is not to be treated as money received by him, petitioner must sustain his burden by the clear preponderance of the evidence.

We have previously had occasion to review the legislative purpose for the enactment of section 357, the predecessor provision of which in the 1939 Code was section 112(k). See *F. W. Drybrough*, 42 T.C. 1029 (1964), on appeal (C.A. 6, Mar. 9, 1965); *Arthur L. Kniffen*, 39 T.C. 553 (1962); *Estate of John G. Stoll*, 38 T.C. 223 (1962); *Jack L. Easson*, 33 T.C. 963 (1960), modified 294 F. 2d 653 (C.A. 9, 1961).

Of course, the statutory provisions pertaining to the present controversy—both section 357 and section 351—are to be applied in the light of the legislative purpose which they are designed to serve. *Griffiths* v. *Commissioner*, 308 U.S. 355 (1939). But in view of our previous discussions of the legislative history of these provisions we need review it only briefly here.

Section 357 was originally enacted to dispel problems arising from the decision of the Supreme Court in *United States* v. *Hendler*, 303 U.S. 564 (1938), rehearing denied 304 U.S. 588 (1938), which suggested that, upon a tax-free exchange, the assumption by the transferee of the transferor's liabilities would constitute "money or other property" to the transferor with the result that, to the extent of such "money or other property," the transferor's gain upon the exchange would be recognized and subjected to tax. Congress intended to nullify the effects of the *Hendler* decision with respect to bona fide transactions and consequently enacted the predecessor of section 357 to permit nonrecognition of gain in bona fide transactions of this kind even though the transferee-corporation assumed liabilities of the transferor. Section 357 (and its predecessor, sec. 112(k), 1939 Code) provided primarily that the assumption of liabilities by the transferor in a section 351 exchange would not be considered as money or other property and would not make section 351 inapplicable to the transaction. However, it was realized that taxpayers might take advantage of this provision to gain unintended tax benefits, so exceptions were written into these sections to provide that if the principal purpose of having the transferee-corporation assume the liabilities on the exchange was to avoid tax, or was not a bona fide business purpose, the liabilities assumed would be considered as money received or "boot" under sections 112(c), I.R.C. 1939, and 351(b).

It requires a careful analysis of the entire statutory scheme to understand just how section 357(c) operates in this context, but such an analysis indicates that it was designed to make certain that the excess of the liabilities assumed over the transferor's basis will be gain recognized on the exchange regardless of the transferor's purpose in having the liabilities assumed. See example illustrating the application of section 357(c) in S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d sess., p. 270 (1954); see also *N. F. Testor*, 40 T.C. 273 (1963), affd. 327 F. 2d 788 (C.A. 7, 1964). However, we are not concerned with section 357(c), because it does not apply here and both parties agree that section 357(b) provides the critical test.

All of these provisions appear to be directed to the transaction in which property is exchanged for stock, and to be limited in application to determining the recognition or nonrecognition of gain, and the amounts thereof, resulting from such transactions alone. They are

not concerned with the tax effects of activities of the transferor-stockholder prior to engaging in the transaction, nor with those of the transferee-corporation after the transaction is completed, except to the extent they might shed some light on the purpose of the taxpayer in entering into the transaction. Compare *F. W. Drybrough, supra,* and *Jack L. Easson, supra.* Section 351 provides that no gain shall be recognized if property is transferred to a corporation solely in exchange for stock and *immediately* after the exchange the transferor is in control of the corporation. Section 357(a) provides that if the transferee assumes liabilities in such a transaction, such assumption shall not be treated as money received and shall not prevent *the exchange* from qualifying under section 351. Section 357(b) refers to the principal purpose of the taxpayer *with respect to the assumption of the liabilities in such a transaction,* and to a purpose to avoid tax *on the exchange.* And section 357(c) relates to the excess of liabilities assumed over the basis of property transferred *pursuant to such an exchange.*

We recognize that section 357(b) directs that in determining the purpose of the taxpayer we must take into consideration "the nature of the liability and the circumstances in the light of which the arrangement for the assumption or acquisition was made." But we believe the indictment of this section is limited to transactions of this nature arranged primarily so that the assumption of the transferee's liability in the transaction itself results in tax avoidance for the transferor, or has no bona fide business purpose. We do not believe it was intended to require recognition of gain on bona fide transactions designed to rearrange one's business affairs in such a manner as to minimize taxes in the future, consistent with existing provisions of the law.

Applying the somewhat general language of section 357(b) to the facts in this case in the light of the principles stated above, in our opinion petitioner has carried his burden of proving by the clear preponderance of the evidence that his principal purpose in having Collins-Crain assume the liabilities it assumed in this transaction or series of transactions was not a purpose to avoid tax on the exchange and was for a bona fide business purpose.

Turning first to the alleged tax avoidance purpose, we do not see how petitioner can be said to have avoided any tax on the exchange except by the nonrecognition of gain on the conversion of assets held individually into corporate ownership, which is one of the very purposes of section 351. Petitioner did not borrow money against the assets transferred in excess of his basis therein immediately before the transfer, as was the situation condemned in *F. W. Drybrough, supra,* but accepted by the Court of Appeals in *Easson* v. *Commissioner,* 294 F. 2d 553 (C.A. 9, 1961). But even if he had done so,

he did not have the corporation assume liabilities in excess of his basis in the assets transferred. It would appear that his economic position was the same immediately after the transaction as it was immediately before the transaction. Presumably he could have withdrawn from his collateral and margin accounts for his own use prior to the transaction the same securities and cash he withdrew prior to the transfer to Collins-Crain. The appreciation in value of the securities transferred would be reflected in the value of petitioner's stock in Collins-Crain after the transfer but would also be subject to the same amount of liabilities they were subject to prior to the transfer. The only tax advantage gained by petitioner would result from having the corporation pay off the liabilities with income, possibly from the securities, which, because of dividends-received credit and the corporate tax rate, had been taxed at a lower rate than it would have been had the securities remained in petitioner's hands. But this is apt to be true as a result of any transaction in which any high-bracket taxpayer incorporates his business assets. As was pointed out in *Arthur L. Kniffen, supra*, in using the term "liability" in sections 351 and 357, Congress was concerned with the *assumption* by the transferee of an existing liability of the transferor, not with the manner in which it might subsequently be discharged. It is clear that as the corporation paid off the liabilities the value of petitioner's stock in Collins-Crain would be increased and petitioner's gain would be recognized upon disposition of that stock. But under the law the gain on that stock will be deferred until it is disposed of, and under section 351 recognition of the gain resulting from the appreciation in value of the securities transferred will also be postponed until the Collins-Crain stock is disposed of. We find no permanent escape from taxation of any of this gain. We do not believe the fact alone that the income which will be used to pay off the liabilities to which the securities were subjected will be taxed at a lower rate falls within the tax-avoidance purpose contemplated in section 357(b).

Unlike in the *Drybrough* case, and in *W. H. Weaver*, 32 T.C. 411 (1959), affirmed sub nom. *Bryan v. Commissioner*, 281 F. 2d 238 (C.A. 4, 1960), petitioner did not incur the liabilities to which the transferred securities were subject immediately prior to the transfer and solely in anticipation thereof. The evidence indicates that the liabilities transferred were incurred by petitioner prior to 1958 and that Dobson did not crystallize his plan or begin analyzing petitioner's assets and liabilities until sometime in February 1958. Furthermore, petitioner and Dobson both testified that Dobson did not advise petitioner to borrow money against the securities to be transferred; he simply decided, with petitioner's acquiescence, which securities were to be transferred. And unlike the $400,000 liability in *Estate of John*

*G. Stoll, supra,* the assets subject to the liabilities assumed were also transferred to the corporation. Nor was petitioner's borrowing against his securities to buy additional securities and to refinance loans at all unusual for petitioner. The evidence indicates that this had been his practice with respect to both his personal assets and corporate assets over which he had control throughout his business experience.

Respondent argues that Dobson's admitted efforts to avoid the effect of section 357(c) by having the liabilities assumed total slightly less than petitioner's basis in the property transferred, and to so arrange the corporate affairs as to avoid the pitfalls of the accumulated earnings tax and personal holding company status, is proof that petitioner's principal purpose in having the corporation assume the liabilities was to avoid tax. As previously noted we find no tax avoidance in limiting the liabilities assumed to petitioner's basis in the property transferred—in fact to not so limit them would be grounds for argument that tax avoidance was a purpose. And in our opinion the arrangement of the corporation's affairs in such a manner as to avoid possible penalty taxes in the future is not a tax-avoidance purpose contemplated by section 357(b). If there was a bona fide business purpose for the transaction, it would be ridiculous not to so arrange it that the corporation would not subsequently run afoul of the provisions of sections 531 and 541, which the penalty taxes imposed thereby were designed to prevent. In fact, it appears from the evidence that one of the principal reasons Dobson suggested having the corporation assume the liabilities was to avoid the accumulated earnings tax *on the corporation* rather than just to have the corporation pay petitioner's liabilities. The evidence indicates that petitioner could have sold a sufficient number of his securities prior to the transaction to pay off the liabilities and, because of the market value of such securities in relation to petitioner's basis in such securities, to have realized a tax loss rather than a gain.

We are also of the opinion that petitioner has carried his burden of proving that there was a bona fide business purpose in having the corporation assume the liabilities in this transaction.

So far as petitioner personally was concerned, it had been his abiding conviction, and one which abetted his split with the Belk heirs and gave rise to the formation of Collins-Crain, that it was vitally important for a dry goods business to own stock of its suppliers and of banks with which it did business, and other marketable securities. He believed that this made possible obtaining supplies and financing at a lower cost, and that the appreciation in value of, and the income received from, such securities would provide the necessary reserves both to weather bad times and for expansion. He also believed that

it was better where possible to borrow money against such securities rather than sell them to obtain necessary funds. He had applied this philosophy quite successfully for a number of years. When the Belk heirs disagreed with this philosophy, it was not unnatural that petitioner should look around for a business which he could buy and control himself. He had been quite successful in such a venture before and felt he could do it again, if he was free to run the business as he felt best. We cannot agree with respondent's suggestion that petitioner acquired Bailes-Collins and Bailes-Collins & Crain just to avoid personal holding company status for Collins-Crain. We think he seriously intended to go into the dry goods business on his own and would still be in it had not the Belks insisted that he get out or sever his connection with the Belk chain. There is no reason to believe that Collins and Crain would have sold their successful businesses to petitioner had they thought it would be a temporary arrangement designed primarily to enhance petitioner's tax position. The fact is that Collins-Crain is still in business, but in a line of business different than the Belk business. It is understandable that petitioner's troubles with Dobson and his subsequent troubles with the Belk heirs severely hampered whatever plans he may have had for expansion of the Collins-Crain business.

Having decided to go into the retail dry goods business on his own, it is not strange that petitioner wanted to operate it in corporate form. In addition to the obvious advantages of operating a risky business in corporate form, he also wanted to avoid letting the Belks know that he was involved in a competing business. It was in accordance with his established practice to provide the corporation with adequate capital for expansion and other purposes. Most of his liquid assets consisted of marketable securities and, inasmuch as he intended to have the corporation acquire securities in any event, there was an adequate business reason for him to transfer some of his better securities to the corporation to provide its working capital. If this was to be done, there was certainly good reason on petitioner's part to require the corporation to assume the liabilities which the securities were pledged to secure. He relied in part on the income from these securities to pay the liabilities and it would seriously impair his own position to transfer these high-yield securities to the corporation without having it assume the liabilities.

So far as the corporation was concerned, there was a bona fide business purpose for it to assume the liabilities. It was receiving securities having a market value of about $1,715,000, and a high yield, in exchange for the assumption of liabilities totaling about $750,000. The indicated income from the securities was in excess of the interest due on the liabilities, and the excess in value of the securities could

be used as working capital if necessary. As said by the Court of Appeals in *Bryan* v. *Commissioner*, 281 F. 2d 238, 242 (C.A. 4, 1960):

The transfer of the properties to corporations, subject to a debt not exceeding his cost, may well have had a business purpose, but it·is his purpose in arranging for the assumption by the corporations of the excess indebtedness which is critical under § 112(k).

We do not think there can be any question about the business purpose in having Collins-Crain assume the liabilities of the two liquidated corporations in exchange for their·operating assets.

We are not naive enough to acknowledge that tax minimization did not play an important role in dictating the manner in which these transactions were arranged, but we think the record clearly supports petitioner's argument that the tax avoidance was not his principal purpose in having the corporation assume the liabilities and that there was a bona fide business purpose in having it do so.

Inasmuch as we have found that section 357(b) does not apply to these transactions, we conclude that section 351(a) does apply and no gain is to be recognized to petitioners ·on the transactions involved.

To reflect concessions on other issues,

*Decisions will be entered under Rule 50.*