ISC Industries Inc., Successor of Indian Finance Corporation v. Commissioner.
ISC Industries, Inc. v. Commissioner
Docket No. 4060-69.
United States Tax Court
T.C. Memo 1971-283; 1971 Tax Ct. Memo LEXIS 50; 30 T.C.M. (CCH) 1216; T.C.M. (RIA) 71283; November 3, 1971, Filed. *50 Petitioner's principal business was the consumer finance business. Using funds borrowed for use in the finance business petitioner purchased 53 percent of the outstanding stock of Lincoln Bakery with the intention that the bakery be merged into petitioner. On the day that the merger was consummated, petitioner mortaged assets of the bakery and transferred them to a wholly owned subsidiary. Petitioner retained the mortgage proceeds for use in its finance business. Petitioner's principal purpose in causing the subsidiary to assume the mortgage was to protect its finance business from a threatened loss of lines of credit. Held: Petitioner's principal purpose in causing the assumption of the mortgage was not avoidance of tax on the exchange but was a bona fide business purpose. Section 357(b) was not applicable to the assumption. Harry P. Dees, Union Federal Bldg., Evansville, Ind., for the petitioner. Jamesj. McGrath, for the respondent. IRWIN
Memorandum Findings of Fact and Opinion IRWIN, Judge: The Commissioner determined the following deficiencies in petitioner's income tax: Year
Deficiency
1964
$ 65,800.74
1965 80,412.05
Total
$146,212.79 Nearly all of these amounts are in controversy *51 as a result of respondent's determination that the principal purpose of petitioner's transfer of property subject to $375,000 of liabilities to its wholly-owned subsidiary in 1964 was tax avoidance on the exchange. Accordingly, respondent has invoked section 357(b) [1] of the Internal Revenue Code of 1954 to hold that petitioner's gain on the exchange is taxable to the extent of the indebtedness assumed. Findings of Fact The original petitioner in this case is the Indian Finance Corporation, organized under the laws of the State of Indiana and having its principal office and place of business at all relevant times in Evansville, Ind. It filed its corporate Federal income tax returns with the district director of internal revenue, Indianapolis, Ind. Petitioner and Indian will hereafter be used to refer to original petitioner, Indian Finance Corporation. On January 5, 1970, a merger plan between Indian and the named petitioner, ISC Industries, Inc., became effective. ISC Industries, Inc., was the surviving corporation, organized under the laws of the State of Delaware and having its *52 principal place of business in Kansas City, Mo. ISC Industries, Inc., is liable at law for any deficiencies determined against Indian in the instant proceedings. During the years at issue Indian was in the consumer finance business. It engaged in the retail or time sales financing of automobiles, furniture, and appliances, and it also made direct loans to consumers pursuant to a small loan license granted by the State of Indiana. Indian also sold credit life insurance and health and accident insurance to its loan customers in addition to engaging in a general insurance business. Indian was among the top 150 companies out of about 7,500 companies in similar lines of business with assets of about $15,000,000 in 1964. In June 1964, Indian's president, Joseph E. O'Daniel, became aware of an opportunity to buy a majority interest in Lincoln Bakery, Inc. (hereafter referred to as Lincoln), a large bakery located in Evansville, Ind. On June 29, 1964, O'Daniel circulated a memorandum among the directors of Indian recommending that the stock of Lincoln be purchased and that thereafter Lincoln be merged into Indian. The basis for O'Daniel's recommendation was that Lincoln had always been profitable *53 and that Indian needed additional profits to obtain more favorable borrowing 1217 rates from the institutions which supplied it with funds for its finance business. At a special meeting held on June 30, 1964, the directors of Indian approved the purchase of 52.846 percent of the outstanding stock of Lincoln for $1,060,000. The price was to be paid with funds that Indian had borrowed for use in its finance business. In addition to the advantages flowing from the anticipated profits of Lincoln the directors felt that Indian would obtain other benefits from the proposed merger. Among these would be the acquisition of roughly 1,400 new shareholders who previously owned the minority interest in Lincoln and some insurance against the decline in profitability in the finance business by diversification. On or about July 1, 1964, the shares of Lincoln were acquired by Indian, and on October 2, 1964, the merger of Lincoln into Indian was finally consummated. At the time of the purchase of the stock the directors of Indian had not decided whether to operate the bakery after the merger as an unincorporated division or as a whollyowned subsidiary corporation. During the time that Indian was in *54 the process of purchasing the Lincoln stock, its directors knew that the proposed acquisition was in violation of agreements that it had with various institutions which were the principal suppliers of funds for its finance business. Because of their conviction that the investment in the bakery was sound, the directors did not anticipate that these financial institutions would oppose the acquisition; however, it developed that upon learning of Indian's investment in the bakery the lending institutions were more than a little concerned. In particular, The Omaha National Bank immediately withdrew its line of credit to Indian's finance business, and several other institutions threatened to withdraw their credit unless Indian took certain steps. In the main, these lenders were concerned that Indian was unfamiliar with the bakery business and that it had diverted over one million dollars that they had lent Indian for the finance business from their intended use. In order to insure continued credit from the financial institutions which supplied it with funds for its finance business, Indian determined that it was necessary to insulate Indian's finance business from any losses or obligations *55 that might be incurred in the bakery's operation and to return for use in the finance business the money that it had used to purchase the Lincoln stock. With the approval of the lending institutions, Indian decided to operate the bakery as a wholly-owned subsidiary corporation after Lincoln's merger into Indian. Indian's plan entailed the transfer of only the operating assets of the bakery to the subsidiary while retaining most of Lincoln's cash and liquid assets and also placing a $375,000 mortgage on the bakery assets which the subsidiary would assume. These latter two steps would reduce Indian's investment in the bakery from over a million dollars to under three hundred thousand. On October 2, 1964, the same day that the merger of Lincoln into Indian became finally consummated, Indian borrowed $375,000 using the bakery assets as security and then transferred the bakery assets subject to this liability to its wholly-owned subsidiary, the "new" Lincoln Bakery, Inc. (hereafter new Lincoln), in exchange for new Lincoln stock. Indian retained the mortgage proceeds for use in its finance business. The gain realized by petitioner on the transfer of assets to "new" Lincoln was $372,572.20. *56 Ultimate Findings of Fact 1. Indian's principal purpose in causing "new" Lincoln to assume the $375,000 of liabilities was to protect its lines of credit for its finance business and was not to avoid Federal income tax on the exchange. 2. Indian's purpose of protecting its lines of credit for its finance business was a bona fide business purpose. Opinion Respondent claims that this case is the classic situation for the application of section 357(b). Petitioner purchased a majority stock interest in Lincoln Bakery, Inc., with the intention that Lincoln be merged into it. On the same day that the merger became finally consummated, petitioner mortgaged the bakery assets for $375,000 and then transferred them to a new subsidiary subject to the obligation in exchange for the stock of the subsidiary. Petitioner retained the mortgage proceeds for use in its finance business. Respondent determined that under these circumstances the assumption of the mortgage by the subsidiary should be treated as money or other property received in a transfer to which section 351 otherwise applied. Accordingly, 1218 respondent found that the gain of $372,572.20 realized on the exchange should be fully recognized *57 because the liabilities assumed exceeded this amount. We disagree with respondent. The legislative and judicial histories with respect to the assumption of liabilities in transactions in which a taxpayer exchanges encumbered property for stock or securities of his controlled corporation are well recounted elsewhere. See Drybrough v. Commissioner, 376 F. 2d 350, at 355-56 (C.A. 6, 1967); [2] *58 W.H.B. Simpson, 43 T.C. 900, at 915-16 (1965); and H. Rept. No. 855, 76th Cong., 1st Sess., pp. 5 and 18-20 (1939). With two exceptions, section 357[3] *59 *60 permits a taxpayer to transfer encumbered property to his controlled corporation in exchange for stock or securities in the corporation without recognition of gain. The exception provided in section 357(c) applies only when the liabilities assumed by the transferee corporation exceed the transferor's basis for the property exchanged and is not here relevant. This case deals with the exception provided in section 357(b). Section 357(b) applies in two cases: (1) where under the applicable circumstances it appears that the principal purpose of the transferor in causing the assumption of the liability was to avoid Federal income tax on the exchange; and (2) where in the absence of a tax avoidance purpose the assumption was not effected for a bona fide business purpose. In these two cases the total amount of all liabilities assumed will be treated as "boot" in determining the amount of gain recognized under section 351(b) and other statutes. Because section 357(b) by its terms deals only with the purpose of a transferor *61 in causing an assumption of liabilities, the cases dealing with this provision have been more concerned with the motives of the taxpayer than with the actual possibility of tax avoidance in a given situation.[4] This 1219 preoccupation with subjective intent stems from section 357(b)(2) which requires that the transferor prove his untainted purpose by a clear preponderance of the evidence. Hence, unless petitioner can show clearly that its purpose for causing the assumption by new Lincoln of the $375,000 mortgage was for a purpose other than tax avoidance on the exchange, respondent will prevail. Thompson v. Campbell, 353 F. 2d 787 (C.A. 5, 1965). In this case, petitioner's purchase of the Lincoln stock jeopardized its finance business because the banks and financial institutions which were its key lines of credit objected to its investment *62 of funds borrowed for the finance business in an unrelated business and threatened to terminate these lines of credit. We believe petitioner's evidence and the testimony of its witnesses that the reaction of the financial institutions to the acquisition of the Lincoln stock was unanticipated and that the steps taken subsequent to the stock purchase were in response to conditions imposed by the financial institutions. Petitioner was required by the circumstances to return most of the funds invested in the bakery to use in its finance business and to isolate the business risks of the bakery from those of the finance business. Placing a mortgage on the bakery's assets and transferring the assets to a subsidiary accomplished petitioner's need in a reasonable manner. Therefore, we conclude that petitioner's principal purpose in making new Lincoln assume the liabilities placed upon the assets transferred to it was not to avoid Federal income taxes on the transfer but to protect the lines of credit for petitioner's finance business. We feel it is immaterial that petitioner may have been able to arrange its affairs in another manner or in a manner that produced more tax revenue; section 357(b) *63 clearly looks to the taxpayer's motives for doing what actually occurred. Furthermore, because the assumption was made chiefly to benefit petitioner's finance business, the business purpose requirement section 357(b)(1)(B) is satisfied easily. Campbell v. Wheeler, 342 F. 2d 837 (C.A. 5, 1965). Although petitioner has in our view carried its burden of proof, it would be helpful to pass upon some points made by respondent. Respondent's main tack at trial was to seek an admission from petitioner's officers that they sought tax advice prior to the mortgage and transfer of the Lincoln assets. We do not believe that section 357(b) contains any inference that limits the taxpayer's access to attorneys and accountants. Petitioner's officers testified that in fact no thought was given to tax avoidance on the transfer to the subsidiary because they did not understand how there could be tax to avoid. Respondent has not offered any evidence which contradicts the explanation given by petitioner but has based his entire argument upon the interpretation given section 357(b) by some commentators. See Surrey, "Assumption of Indebtedness in Tax-Free Exchanges," 50 Yale L.J. 1 (1940); and Bittker and *64 Eustice, Federal Income Taxation of Shareholders and Corporations, sec. 3.06 (2d ed. 1966). The situation noted by the authors as being indicative of a tax avoidance purpose is the nearly contemporaneous mortgage of property by an individual and its transfer to a controlled corporation. Helpful as their analysis may be, we do not believe that any of the authorities cited by respondent has urged that every taxpayer who encumbers property and immediately thereafter transfers it to his controlled corporation is attempting to avoid tax. Section 357(b) speaks of the taxpayer's purpose in causing the assumption, and the determination of purpose must be made from an analysis of all facts and not from merely looking at the time span between the creation of the liability and its assumption by the corporation. Decision will be entered for the petitioner. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. The Sixth Circuit in Drybrough affirmed in part and reversed in part our decision in F.W. Drybrough, 42 T.C. 1029 (1964). We note that the reviewing court affirmed our finding that section 357(b) applied to an assumption of a mortgage liability which had been incurred only two months prior to the transfer of the property by the taxpayer to his controlled corporation. In that case we found that the taxpayer had not shown any business purpose in causing the assumption of liability, and consequently we sustained the respondent's determination that the petitioner's principal purpose was tax avoidance. In this case we find ample evidence that petitioner had valid business reasons for causing its subsidiary to assume the mortgages on the transferred property. 3. SEC. 357. ASSUMPTION OF LIABILITY. (a) General Rule. - Except a provided in subsections (b) and (c), if - (1) the taxpayer receives property which would be permitted to be received under section 351, 361, 371, or 374 without the recognition of gain if it were the sole consideration, and (2) as part of the consideration, another party to the exchange assumes a liability of the taxpayer, or acquires from the taxpayer property subject to a liability then such assumption or acquisition shall not be treated as money or other property, and shall not prevent the exchange from being within the provisions of section 351, 361, 371, or 374, as the case may be. (b) Tax Avoidance Purpose. - (1) In general. - If, taking into consideration the nature of the liability and the circumstances in the light of which the arrangement for the assumption or acquisition was made, it appears that the principal purpose of the taxpayer with respect to the assumption or acquisition described in subsection (a) - (A) was a purpose to avoid Federal income tax on the exchange, or (B) if not such purpose, was not a bona fide business purpose, then such assumption or acquisition (in the total amount of the liability assumed or acquired pursuant to such exchange) shall, for purposes of section 351, 361, 371, or 374 (as the case may be), be considered as money received by the taxpayer on the exchange. (2) Burden of proof. - In any suit or proceeding where the burden is on the taxpayer to prove such assumption or acquisition is not to be treated as money received by the taxpayer, such burden shall not be considered as sustained unless the taxpayer sustains such burden by the clear preponderance of the evidence. (c) Liabilities in Excess of Basis. - (1) In general. - In the case of an exchange- (A) to which section 351 applies, or (B) to which section 361 applies by reason of a plan of reorganization within the meaning of section 368(a)(1)(D), if the sum of the amount of the liabilities assumed, plus the amount of the liabilities to which the property is subject, exceeds the total of the adjusted basis of the property transferred pursuant to such exchange, then such excess shall be considered as a gain from the sale or exchange of a capital asset or of property which is not a capital asset, as the case may be. (2) Exceptions. - Paragraph (1) shall not apply to any exchange to which - (A) subsection (b)(1) of this section applies, or (B) section 371 or 374↩ applies.
4. In W.H. Weaver, 32 T.C. 411 (1959), affd. sub nom. Bryan v. Commissioner, 281 F. 2d 238 (C.A. 4, 1960), we discussed whether taxes would be avoided because respondent did not rely upon the predecessor of section 357(b)↩ until his amended answer. In that circumstance it was necessary to investigate whether the respondent's contention was correct.