**F. W. DRYBROUGH et al., Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 16525.

United States Court of Appeals
Sixth Circuit.
March 30, 1967.

---

Rucker Todd, Louisville, Ky., for petitioners, Brown, Ardery, Todd & Dudley, Louisville, Ky., of counsel.

Robert A. Bernstein, Tax Division, Dept. of Justice, Washington, D. C., for respondent, John B. Jones, Jr., Acting Asst. Atty. Gen., Lee A. Jackson, David O. Walter, Herbert Grossman, Attys., Dept. of Justice, Washington, D. C., on the brief.

Before O'SULLIVAN and CELEBREZZE, Circuit Judges, and McALLISTER, Senior Circuit Judge.

O'SULLIVAN, Circuit Judge.

This matter is before us on the petition of taxpayers, F. W. Drybrough and the executor of the estate of his deceased wife, Citizens Fidelity Bank & Trust Company, to review a decision of the Tax Court of the United States, reported as Drybrough v. Commissioner, 42 T.C. 1029 (1964). Conduct by F. W. Drybrough is primarily involved and we shall refer only to him as the taxpayer or petitioner. The issues before us are (1) the tax effect of the assumption of liabilities in connection with transfers by Drybrough to controlled corporations, and (2) the deductibility of interest paid on certain mortgage indebtedness. The Tax Court opinion sets out in extensive detail the complicated transactions that provide the background of the case before us, and we relate here only such facts as are relevant to the conclusions we reach.

Commencing in the twenties and continuing to the time of the events here involved, Drybrough had been a successful investor in downtown Louisville real estate and, with his wife, also operated a successful mercantile collection agency. To implement acquisition of various holdings, he borrowed heavily from banks and insurance companies. Thus in 1940, 1945 and 1946, years of relevance here, Drybrough borrowed, on the security of his real estate holdings, the sums of $200,000.00, $200,000.00 and $500,000.00, respectively, from the National Life and Accident Insurance Company (National Life). These borrowings were generally used to pay off or consolidate balances of existing mortgages or to acquire additional parcels of real estate.

On April 3, 1953, Drybrough borrowed $700,000.00 from National Life, secured by a mortgage on several parcels of real estate. Of such monies, $357,185.16 was used to pay off his 1946 loan from Na-

tional Life and some other debts and expenses. The balance, $342,814.84, was deposited in Drybrough's commercial account with the Liberty National Bank & Trust Co. of Louisville. In May, following, Drybrough withdrew from this account $203,602.00 and transferred such sum to an account styled "Public Garage, M. S. Drybrough, owner," allegedly as partial payment of principal and the accrued interest due upon a note of $260,-000.00 which he had, on January 1, 1952, given to his wife to evidence an indebtedness to her. Although the Public Garage account into which this sum was deposited was in Marion's name, Drybrough had power to draw checks on it. It may be assumed that it was he who subsequently proceeded to buy, in Marion's name, $200,000 of tax exempt securities, paying for them out of the Public Garage account funds.

In 1957 Drybrough still owed $600,000 on the 1953 loan from National Life. At that time he desired to incorporate certain of his real estate holdings and have the resulting companies take over the payment of the 1953 mortgage balance. In suggesting a way this result could be achieved, Drybrough, on February 27, 1957, wrote to the mortgagee, National Life, saying:

"I would like to have this blanket mortgage (the 1953 $700,000 borrowing) broken into four direct mortgages and suggest $250,000.00, $100,000.00, $75,-000.00 and $175,000.00. I would pay anything over and beyond $600,000 owing at the time of executing the new mortgages and cancelling the old.

"As you and Mr. Weaver know and as I explained to you in person several months ago, I have been waiting to incorporate some of my properties and interests for quite a long time."

But this approach was abandoned because new separate mortgages would have called for higher rates of interest and less favorable prepayment terms. Accordingly, Drybrough decided simply to have each of the corporations he planned on creating assume a share of the already existing mortgage. This was done; on June 1, 1957, he transferred to four newly organized corporations, each named by its Louisville street address, four parcels of real estate subject to the 1953 mortgage; each of the corporations agreed to pay an assigned share of that mortgage. Drybrough received all of the issued shares of stock of the respective corporations, and shortly thereafter made a gift of 40% of such shares to his son, F. W. Drybrough, Jr.

On March 15, 1957, Drybrough borrowed the sum of $150,000 from the Liberty Bank of Louisville, mortgaging a property known as 620 South Fifth Street. This property was once a part of the security for the 1953 loan, but had been released therefrom in 1956. Relevant to this property, Drybrough had, in 1956, included in a letter to National Life the observation that, "620 South Fifth and the Mexican Village property are both clear and I am eager to mortgage them to the limit before combining these two properties in a corporation." The proceeds of this $150,000 loan were deposited in Drybrough's commercial account at the Liberty Bank. Drybrough testified that he had an original intention to use this money to acquire some additional property, but the specific proceeds were not so employed; they were disbursed by Drybrough primarily to purchase tax exempt securities. He did, however, use other of his funds to purchase two parcels of property costing over $150,000. After putting the $150,000 mortgage on the 620 South Fifth Street property, he conveyed, by gift, an undivided 40% interest in the fee thereof to his son. Thereafter on June 28, 1957, the father and son transferred this property to a new corporation, 620 South Fifth Street, Inc., in exchange for 60% and 40%, respectively, of that company's issued shares. The corporation took title to the property subject to the $150,000 mortgage and assumed and agreed to pay its then balance of $149,000.

A total of five corporations were thus created in 1957, four of them assuming the balance unpaid on the 1953 mort-

gage, and the fifth assuming the 1957 mortgage. We have set out in the margin their names, their dates of incorporation, the fair market values of the transferred properties, Drybrough's total basis in these properties and the amount of liability assumed by each corporation.[1]

On their joint tax return for 1957, Drybrough and Marion reported $223,806.12 as long term capital gain arising from the transfers of the properties to, and the assumption of liability by, the newly created controlled corporations. That sum represented the total amount by which the mortgage debt assumed by the transferee corporations exceeded Drybrough's basis in the respective assets transferred; such amount would be taxable under Int.Rev.Code, 1954, Section 357(c) (1), and the taxpayer's return assumed that the gain on the transfers was not otherwise taxable by virtue of the provisions of § 357(a) of the Code. We set out §§ 357(a) and 357(c) (1) below.[2] The Commissioner, however, assessed a deficiency, claiming that Section 357(b) IRC 1954,[3] controlled, on his assertion that Drybrough had failed to prove that his principal purpose in arranging these transactions was not that of tax avoidance and was not for a bona fide business purpose and, therefore, the assumption of

[1]

| Name of Corporation<br>Date of Filing | Fair Market<br>Value of<br>Real Estate | Drybrough's<br>Total basis | Liability<br>assumed |
|---|---|---|---|
| June 1, 1957 | | | |
| 800 South Fourth Street, Inc | $200,000.00 | $ 83,682.17 | $100,000 |
| June 1, 1957 | | | |
| 720 South Fifth Street, Inc | 212,750.00 | 83,293.28 | 75,000 |
| June 1, 1957 | | | |
| 725 South Fourth Street, Inc | 234,400.00 | 79,955.94 | 175,000 |
| June 1, 1957 | | | |
| 655 South Fifth Street, Inc | 397,250.00 | 161,076.16 | 250,000 |
| June 28, 1957 | | | |
| 620 South Fifth Street, Inc | 238,750.00 | 103,840.12 | 149,000 |

2. § 357 Assumption of liability.

(a) General rule.—Except as provided in subsections (b) and (c), if—

(1) the taxpayer receives property which would be permitted to be received under section 351, 361, or 371 without the recognition of gain if it were the sole consideration, and

(2) as part of the consideration, another party to the exchange assumes a liability of the taxpayer, or acquires from the taxpayer property subject to a liability,

then such assumption or acquisition shall not be treated as money or other property, and shall not prevent the exchange from being within the provisions of section 351, 361, or 371, as the case may be.

(c) Liabilities in excess of basis.—

(1) * * * if the sum of the amount of the liabilities assumed, plus the amount of the liabilities to which the property is subject, exceeds the total of the adjusted basis of the property transferred pursuant to such exchange, then such excess shall be considered as a gain from the sale or exchange of a capital asset or of property which is not a capital asset, as the case may be.

3. § 357 * * *

(b) Tax avoidance purpose.

(1) In general.—If, taking into consideration the nature of the liability and the circumstances in the light of which the arrangement for the assumption or acquisition was made, it appears that the principal purpose of the taxpayer with respect to the assumption or acquisition described in subsection (a)—

(A) was a purpose to avoid Federal income tax on the exchange, or

(B) if not such purpose, was not a bona fide business purpose,

then such assumption or acquisition (in the total amount of the liability assumed or acquired pursuant to such exchange) shall, for purposes of section 351, 361, or 371 (as the case may be), be considered as money received by the taxpayer on the exchange.

(2) Burden of proof.—In any suit or proceeding where the burden is on the taxpayer to prove such assumption or acquisition is not to be treated as money received by the taxpayer, such burden shall not be considered as sustained unless the taxpayer sustains such burden by the clear preponderance of the evidence.

the liabilities should be treated as money received on the exchange. A deficiency of $170,306.89 was assessed for the year 1957.

The Commissioner also disallowed Drybrough's deduction of the interest paid on $200,000.00 of the $700,000.00 borrowed in 1953, on the claim that this sum was used to purchase tax exempt securities. Section 265(2) IRC 1954 forbids such deduction.[4] A deficiency arising from the disallowance of these interest deductions was accordingly assessed.

The Tax Court sustained the Commissioner's determinations in the above respects. We reverse the Tax Court's holding that the assumption of a total of $600,000.00 of the 1953 borrowing by the four corporations organized on June 1, 1957, was taxable in full. We affirm its holding as to the assumption of the $149,000 mortgage by 620 South Fifth Street, Inc. (the 1957 borrowing); and we affirm the disallowance of the interest paid on $200,000 of the 1957 mortgage of $700,000.

1) 1957 corporate assumptions of 1953 mortgage debt.

Until the Supreme Court's 1938 decision in United States v. Hendler, 303 U.S. 564, 58 S.Ct. 655, 82 L.Ed. 1018 (1938), taxpayers and the Treasury Department had assumed that no taxable event occurred when a taxpayer transferred encumbered assets to a controlled corporation which assumed the obligations of the encumbrance. Such an assumption was not considered as "other property or money" as those terms were used in Code sections precedent to §§ 351 IRC 1954 and 112(b) (5) IRC 1939, the sections which provided for the familiar "tax free exchanges" identified under the term "Transfer to Corporation Controlled by Transferor." The simplest form of such a tax free exchange was the changing of a business enterprise from a proprietorship to the corporate form. Even though the assets transferred had acquired a market value in excess of their cost, or base, and consequently the stock shares received by the transferor were worth the enhanced value of the transferred assets, still no taxable gain was then realized. Such gain, however, did not escape taxation because upon subsequent sale or other transfer, the stock shares carried the same basis as the original assets that had been transferred. The *Hendler* decision, however, held that the amount of such an assumed obligation was equivalent to "other property or money" and required that the gain be immediately recognized by the transferor. Continued application of this rule forebode serious consequences to the federal treasury as well as to taxpayers, and Congress was quick to provide amelioration by enactment of the predecessor to § 357. See Surrey, "Assumption of Indebtedness in Tax-Free Exchanges," Vol. 50, Yale Law Journal 1 (1940). Section 112(k) IRC 1939 was adopted as the needed remedy, providing that in an otherwise tax-free exchange if "as part of the consideration another party (the transferee) to the exchange assumes a liability of the taxpayer (the transferor) or acquires from the taxpayer property subject to a liability, such assumption or acquisition shall not be considered as 'other property or money' received by the taxpayer * * *".

To guard against abuse of the privilege granted, Congress attached an exception which now as part of § 357 provides in subsection (b) (set out in full above in footnote three) that if in making the exchange, the principal purpose of the taxpayer with respect to the assumption or acquisition was a purpose to avoid federal income tax *"on the exchange,"* or if not such purpose, was not a bona fide business purpose, then the assumption or acquisition should in

---

4. § 265 * * * No deduction shall be allowed for—
    (2) Interest.—Interest on indebtedness incurred or continued to purchase or carry obligations (other than obligations of the United States issued after September 24, 1917, and originally subscribed for by the taxpayer) the interest on which is wholly exempt from the taxes imposed by this subtitle. 26 U.S.C. § 265(2).

the total amount thereof be considered "as money received by the taxpayer on the exchange." This section also provides that in determining the principal purpose of the taxpayer there should be taken "into consideration the nature of the liability and the circumstances in the light of which the arrangement for the assumption or acquisition was made." Notwithstanding this broad contextual area to be considered, we emphasize that the purpose to avoid income tax is precisely narrowed to a purpose *"with respect to the assumption"* and to a purpose to avoid income tax *"on the exchange."*

■ We read this language as excluding from identification as a purpose to avoid tax *on the exchange,* the original and unrelated motivation for borrowing the money which created the assumed obligation. In this case, Drybrough in 1953 borrowed $700,000; substantially one-half of this sum was used to pay off existing mortgage indebtedness and expenses connected with the borrowing, and the other half was deposited in Drybrough's bank account. Of this latter amount, Drybrough used $203,602 to pay accrued interest and principal on a note allegedly owing to his wife; he also paid some $90,493.00 to his collection agency and $5,000 to his wife to reimburse advances which had admittedly been made to him to purchase further real estate. We may accept the Tax Court's unclear assertion that the note to Drybrough's wife was a sham, and that of the money allegedly paid thereon, $200,000 had been in truth borrowed and used to purchase tax exempt securities. We cannot find or infer, however, that the purposes thus served revealed as a matter of fact or law a purpose to avoid income tax "on the exchange" made *four years later* when in 1957 Drybrough's business as an investor in real estate was converted from a proprietorship to corporate enterprises. Assuming an intent by Drybrough to save or avoid income tax by the 1953 purchase of tax exempt securities, such purpose cannot be said to be

a part of "the principal purpose of the taxpayer (Drybrough) with respect to the assumption" of the balance of the 1953 loan by the corporations which came into existence in 1957.

It is clear that the Tax Court was of the view that under the facts of this case a purpose to avoid income tax "on the exchange" could be found by inquiry into the reasons for, and the use of the proceeds of, the 1953 borrowing. Its opinion extensively details facts relevant to this subject and then observes:

> "Drybrough urges that the focal point of our inquiry should be his purpose with respect to the assumption on the exchange and contends that Congress was concerned with the 'taxpayer's specific purpose in having a liability assumed and not with taxpayer's reason for entering into the tax free exchange.' [We do not necessarily subscribe fully to this broad assertion by Drybrough]. In view of the introductory language of section 357(b), i. e., 'taking into consideration the nature of the liability and the circumstances in the light of which the arrangement for the assumption * * * was made,' we cannot read this section in the restrictive manner urged by Drybrough. *We believe that it is relevant to the 1957 assumption of Drybrough's liabilities by the newly formed corporations to consider the nature of the liability assumed."* 42 T.C. at 1043 (Emphasis supplied.)

Under the statute's language, it was proper to consider "the nature of the liability assumed" but under the facts of this case we do not consider that the use that Drybrough made of the 1953 borrowing was of controlling importance here. With some intervening language, the above quoted excerpt was followed by emphasis on the fact that by having the corporations assume the debt owed by him, he reduced his exposure to personal liability.

> "Thus, although Drybrough stood as security for the corporate indebtedness,

he would not, as a practical matter, have been called upon to satisfy the liabilities, except in the most unusual circumstances." 42 T.C. at 1043, 1044. Such is true, but is no more than the result in all tax free exchanges where a wholly owned corporation is successor to the assets and liabilities of a proprietorship.

With reference to the inquiry into the use made by Drybrough of the proceeds of the 1953 borrowing, the language of the Ninth Circuit in Easson v. C. I. R., 294 F.2d 653, 659 (CA 9, 1961) is pertinent:

"The test suggested by the Commissioner looks to the origin of the encumbrance and to the use of the proceeds derived from it. Section 112(k) [predecessor to § 357], however, says nothing about the origin of the encumbrance. It says only that if a corporation 'acquires from the taxpayer property subject to a liability such * * * acquisition shall not be considered as' boot, unless the taxpayer's principal purpose regarding the acquisition is tax avoidance or not a bona fide business purpose. *Nor is there anything in the section which deals with the reasons for the encumbrance, or the manner in which the mortgage proceeds are used.*" (Emphasis supplied.)

There was evidence also that part of the motivation for incorporating was to allow the long term retirement of Drybrough's debt out of the corporate earnings; such earnings, when applied to the 1953 loan, would likely be taxed at a lower rate than they would be in Drybrough's own tax bracket. Drybrough's expectation, however, that income tax would be saved by the lower rate that would apply to the corporate earnings as contrasted with his own income tax exposure was not, in our view, a purpose to avoid "Federal income tax *on the exchange.*" We read such to be the holding of the Tax Court's own decision in W. H. B. Simpson v. Commissioner, 43 T.C. 900 (1965) announced some months after the decision before us. In *Simpson,* the Tax Court said,

"We do not believe it (§ 357(b)) was intended to require recognition of gain on bona fide transactions designed to rearrange one's business affairs in such a manner as to minimize *taxes in the future,* consistent with existing provisions of the law." (Emphasis supplied.) 43 T.C. at 916.

and further observed therein,

"As was pointed out in *Arthur L. Kniffen,* supra, in using the term 'liability' in sections 351 and 357, Congress was concerned with the *assumption* by the transferee of an existing liability of the transferor, not with the manner in which it might subsequently be discharged. It is clear that as the corporation paid off the liabilities the value of petitioner's stock in Collins-Crain would be increased and petitioner's gain would be recognized upon disposition of that stock. But under the law the gain on that stock will be deferred until it is disposed of, and under section 351 recognition of the gain resulting from the appreciation in value of the securities transferred will also be postponed until the Collins-Crain stock is disposed of. We find no permanent escape from taxation of any of this gain. We do not believe the fact alone that the income which will be used to pay off the liabilities to which the securities were subjected will be taxed at a lower rate falls within the tax-avoidance purpose contemplated in section 357 (b)." 43 T.C. at 917.

In *Simpson,* supra, the Tax Court held the exchange there made to be tax free and in seeking to distinguish *Simpson* from its earlier decision of the *Drybrough* case which we now review, said:

"Unlike in the Drybrough case, and in W. H. Weaver, 32 T.C. 411 (1959) affirmed sub nom. Bryan v. Commissioner, 281 F.2d 238 (C.A. 4, 1960), petitioner did not incur the liabilities to which the transferred securities

were subject *immediately prior to the transfer and solely in anticipation thereof.*" 43 T.C. at 917. (Emphasis supplied.)

But in the case before us the 1953 mortgage liability of Drybrough had not been incurred "immediately prior to the transfer" and was not incurred "solely in anticipation" of the forming of the corporations in 1957.

■ While the Tax Court did not with desirable clarity give separate treatment to the tax avoidance purpose as distinguished from the need of Drybrough to prove also that his 1957 incorporations had "a bona fide business purpose," we read its decision as a finding that Drybrough did not have "a bona fide business purpose" for the 1957 incorporations. This was error. Drybrough testified that included in his motivation for not paying off the $600,000 mortgage before incorporating was his desire to keep as liquid as possible to be able to make further investments; to put the involved real estate investments in a more manageable condition for estate planning; and generally to obtain the advantages that attend operating in the corporate form. The Tax Court's suggestion that Drybrough by liquidating other assets could have obtained sufficient cash to pay off the $600,000 so that the corporate assets would be debt free is not impressive. Such conduct would be unwise and certainly not good practice. For many years Drybrough was engaged in the business of buying and holding downtown Louisville real estate, and operating those holdings in various enterprises such as parking lots. The conversion of these businesses into corporate form was clearly to serve a bona fide business purpose. What was done here was substantially the "garden variety" of tax free exchange—the shift of a proprietorship to a wholly owned corporation which assumed the debts of the proprietorship.

■ We are aware that we are not at liberty to set aside findings of fact made by the Tax Court unless we can say that such findings of fact are clearly erroneous. Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960). If we are, or would be, required to view as findings of fact the critical finding that Drybrough had failed to meet his burden of proving that his principal purpose in having his four corporations assume the existing 1953 indebtedness was not "to avoid Federal income tax on the exchange," and that Drybrough also failed to show that what he did was for a bona fide business purpose, we would, and do, hold such findings clearly erroneous. We are of the view, however, that the Tax Court's use of impermissible tests in assessing Drybrough's purposes amounted to an error of law subject to our review, and we reverse its determination that the assumption in question is controlled by § 357(b) of the 1954 Internal Revenue Code.

2) Corporate assumption of the 1957 $150,000.00 mortgage.

■ We sustain the Tax Court's holding that the assumption by 620 South Fifth Street, Inc., on June 28, 1957, of the $150,000 mortgage which had been placed on the assets transferred to that corporation on March 15, 1957, had not been proven by Drybrough to be otherwise than for a principal purpose "to avoid income tax on the exchange." In late 1956 Drybrough had, with reference to the 620 South Fifth Street property, written to National Life "620 South Fifth and the Mexican Village property are both clear and I am eager to mortgage them to the limit before combining these two properties in a corporation." This was a clear expression that the creation of the debt was directly in anticipation of, and connected in purpose with, having the corporation assume the debt, thus releasing to Drybrough $150,000 of the value of this asset without a present realization of taxable gain on the exchange. The borrowed money was used to purchase tax-exempt securities; it was not used to carry on the purposes

of the business enterprise of 620 South Fifth Street, Inc., nor in furtherance of Drybrough's general real estate investments, justifying also a finding that the assumption could not be accommodated under the "bona fide business purpose" requirement of § 357(b) (1) (B). We think it was a fair inference too that Drybrough's conduct was equivalent to a pro tanto liquidation of the involved asset, and that his purpose "with respect to the assumption" disclosed a plan to avoid realization of gain on this liquidation by selling the mortgaged asset to his controlled corporation. It was permissible for the Tax Court to find in this transaction "a purpose to avoid Federal income tax on the exchange," § 357 (b) (1) (A).

We find no fault with the legal standard employed to reach the above conclusions; and cannot hold as clearly erroneous the factual findings involved.

3) Disallowance of interest deduction on $200,000.00.

Out of the proceeds of the 1953 borrowing of $700,000 Drybrough put $203,602.00 into the Public Garage account, allegedly as payment on indebtedness to his wife, and then used $200,000 of that payment to purchase tax exempt bonds in the name of his wife Marion. Applying § 265 of the 1954 Code, the Commissioner disallowed the deduction taken for interest paid on the $700,000 mortgage to the extent of $200,000.00. The Tax Court found support for the Commissioner on two grounds: first, that Drybrough's claim that he owed his wife the $203,602.00 put into her account was a sham; and second, that even if the $200,000 used to purchase the tax exempt securities was Marion Drybrough's money, the 1953 borrowing of $700,000 was, to the extent of $200,000, "indebtedness incurred or continued to purchase or carry obligations * * * the interest on which is wholly exempt from the taxes imposed by this title," and therefore under § 265(2) IRC 1954, the interest thereon was not deductible.

The first position of the Tax Court involved a finding of fact which, under *Duberstein*, supra, is beyond our review unless clearly erroneous. We do not consider that it was clearly erroneous and, therefore, affirm the Tax Court. The burden was on the taxpayer to establish that the deduction taken for interest on $200,000 of the involved loan did not offend the Revenue Code. Bishop v. C. I. R., 342 F.2d 757, 759 (CA 6, 1965). To meet this burden, Drybrough testified that at a time in 1951 when he was engaged in Tax Court litigation, he directed an accountant to gather and total numerous borrowings by Drybrough from his wife, made principally through drawing upon his wife's Public Garage account. The period covered went back to 1942 and the study ended in a determination that as of *the end, of* 1951 Drybrough owed his wife the quite substantial sum of $282,234.03. This sum was reached by the accountant in large part from totalling check stubs of the Public Garage account, aided by Drybrough's identification of the various checks as representing Drybrough's use of his wife's money to pay obligations that were legally his, such as the cost of running a quite expensive household. Until this compilation, there had not been earlier repayment or formal recognition as a debt by Drybrough of this surprising amount of use of his wife's money. Further circumstances casting doubt upon the genuineness of Drybrough's claims in this regard are set out in the Tax Court opinion leading it to this conclusion:

"In light of the contrary evidence in the record, we view the fact that the account from which the funds used to purchase the securities were withdrawn was styled 'Public Garage, M. S. Drybrough, Owner,' and Drybrough's testimony that the funds therein were the property of Marion exclusively, as insufficient to establish that these funds were in reality her separate property. * * * We be-

**360**

lieve that the account was kept in Marion's name only as a mere formalism, which existed solely to alter tax liabilities." 42 T.C. at 1051, 1052.

■ In considering the factual issue involved, the Tax Court was not required to accept as true Drybrough's testimony even though not directly contradicted, and could weigh the inherent incredibility of his total claims against his spoken words. Quock Ting v. United States, 140 U.S. 417, 420, 11 S.Ct. 733, 35 L. Ed. 501 (1891); Hasson v. Commissioner of Internal Revenue, 239 F.2d 778, 782 (CA 6, 1956); Wood v. Commissioner of Internal Revenue, 338 F.2d 602, 605 (CA 9, 1964).

■ The courts must scrutinize with special care the dealings between husband and wife, especially where, as here, the husband appeared to have carte blanche to use what he claims was his wife's money. Fouke v. Commissioner, 2 B.T.A. 219, 220–221 (1925). Drybrough had the burden of overcoming the presumption of validity of the Commissioner's determination respecting his alleged income tax deficiencies. Bishop v. Commissioner of Internal Revenue, 342 F.2d 757, 759 (CA 6, 1965); Hallabrin v. Commissioner of Internal Revenue, 325 F.2d 298, 305 (CA 6, 1963). We cannot say that the Tax Court was clearly erroneous in concluding that that burden was not carried. This view obviates our discussion of other contentions of Drybrough as to the debtor-creditor relationship between him and his wife; the Tax Court's opinion adequately disposes of them.

Accordingly, we reverse the Tax Court's decision to the extent that it finds that the assumption of the balance of the 1953 loan by the four corporations organized on June 1, 1957, should "be considered as money received by the taxpayer (Drybrough) on the exchange," § 357(b) IRC 1954; in all other respects, relevant to this petition for review, the Tax Court's decision is affirmed.