AMEDEO LOUIS MARIORENZI and GRACE MARY MARIORENZI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mariorenzi v. Commissioner
Docket No. 3708-71.
United States Tax Court
T.C. Memo 1973-141; 1973 Tax Ct. Memo LEXIS 143; 32 T.C.M. (CCH) 681; T.C.M. (RIA) 73141; June 28, 1973, Filed. *143 Louis J. Vallone, for the petitioners. Peter J. Panuthos, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION The Commissioner determined a $1,372.66 deficiency in petitioner's 1968 income tax. The only issue remaining in controversy is whether interest paid by petitioners on a mortgage loan was nondeductible pursuant to section 265(2), I.R.C. 1954, because the indebtedness was incurred or continued by them to purchase or carry tax-exempt securities. FINDINGS OF FACT The parties have filed a stipulation of facts which, together with accompanying exhibits, is incorporated herein by this reference. 2 Petitioners, Amedeo L. Mariorenzi and his wife Grace, resided in Cranston, Rhode Island, at the time they filed their petition herein. The husband ("petitioner" or "Dr. Mariorenzi") was an orthopedic surgeon in the United States Air Force for four years, until the end of 1964 when he entered into private practice. His wife was not gainfully employed nor did she have any separate income during any of the years relevant herein. Dr. Mariorenzi's income rose sharply during his years in private practice. Petitioners' *144 "taxable income" for 1964-68 [total gross income minus all business and other deductions (including depreciation) and minus personal exemptions], as shown in Income Averaging schedules of their 1967 and 1968 returns, was as follows: 1964
$ 3,155.67
1965
89,922.81
1966
135,176.94
1967
160,783.19
1968
204,757.89
Petitioners had been living in a modest house which they owned, but which was becoming too small for them and their growing family. (The record shows that they had five children in 1967.) In the summer of 1966 petitioners purchased land upon which they intended to build a new home. The purchase price for the land was $10,000, which was paid from petitioners' savings. 3 In September, 1966, after plans for the house were drawn, petitioners discussed the possibility of a mortgage loan with representatives of the Industrial National Bank of Rhode Island, at which they maintained a checking account. At some undisclosed time they filed an application for such loan, and were given to understand that a mortgage construction loan at a 6 1/4 percent rate of interest would be available to them, and that the proceeds of the loan would be released to them *145 from time to time during the course of construction. The record does not show that the bank made any binding commitment to that effect, or that any contract or agreement pertaining to any such arrangement was ever entered into between petitioners and the bank. In any event, petitioners did not in fact enter into any such arrangement with the bank, and the construction of the house was paid for in full out of Dr. Mariorenzi's current earnings. Petitioners did not have an architect, but a Mr. De Angelis (a cousin of Dr. Mariorenzi), who owned or controlled the contracting company that built the new house, drew up the plans himself. The foundation was laid in November, 1966; construction of the building itself was begun in the spring of 1967 and was completed before the end of the year. By December of 1967 petitioners had moved into their new home, which was then fully paid for. The total cost of construction was $41,912.75, which petitioners paid to Mr. De Angelis or his company in four installments, as follows: 4 May30, 1967
$10,300.00
August 1, 1967
13,450.00
October 27, 1967
13,450.00
December 15, 1967
4,712.75
$41,912.75
No mortgage loan had *146 been made in respect of petitioners' home by the end of 1967, nor does the record show that there was any binding commitment, or agreement, or contract outstanding at that time calling for the making of any such loan. The record does show that the matter of a mortgage loan was reactivated at around that time and that such loan was in fact made in January, 1968, at a 5 3/4 percent rate of interest, as hereinafter more fully set forth. Petitioners, at or about the time their new house was built, sold their old home for $18,000. It was subject to a mortgage loan in an undisclosed amount, which was paid off at the time of the sale. The record does not disclose the net amount of proceeds which petitioners derived from that sale, or what disposition was made of such proceeds. Around June of 1967, petitioners consulted with their attorney concerning their financial affairs, and, upon his recommendation, they decided to open an "agency account" with the Rhode Island Hospital Trust Company, which would help them manage their investments. Accordingly, on June 7, 1967, petitioners transferred to the Rhode Island Hospital Trust Company three savings bank passbooks showing 5 a balance *147 in the total amount of $35,334.38, to open a Supervisory Agency Account in petitioner's name. By a letter to petitioner dated August 7, 1967, it made certain recommendations concerning the investment of the funds in the account, including the following: Finally, what with the bond markets being at their lowest levels in a number of years, we feel that you should invest $20,000 in tax exempt bonds. These certainly are far more advantageous to you than corporate bonds because of your very high tax bracket and what with the almost certain enactment of a surtax, they will benefit you even more. Our usual objective for a growth account such as yours is to have approximately 20 percent of the funds invested in tax-exempt bonds and the remaining 80 percent in high-quality growth stocks. With the stock market being at what we consider a fairly high level now and the tax-exempt bond market being at a quite attractive level, however, we feel that most of the funds should be committed to this latter area now. As you make additional funds available to us, we will build up the common stock portion of the portfolio on market dips. During the period from August, 1967, through June, 1968, *148 petitioner had other communications with Rhode Island Hospital Trust Company. He always accepted its investment advice, and from time to time he deposited additional funds in the account to cover the investments which were made in his name, including both common stock of various companies and tax-exempt securities. In January, 1968, the Rhode Island Hospital Trust Company continued to favor tax-exempt bonds for petitioner, 6 and in a letter to petitioner dated January 17, 1968, in respect of certain additional funds which petitioner had transmitted, it stated: In view of the current conditions in both the bond and the stock markets, we feel that approximately 60 percent of the funds in question should be invested in high-quality tax-exempt bonds which would be beneficial to you as a resident of Rhode Island. We ask your authority to select such an issue. We feel the remaining 40 percent of the funds should be invested in good-quality growth stocks which seem reasonably priced at current levels. The following table reflects the deposits petitioner made in the foregoing "agency" account and the purchases which were made with those deposits: 7 RHODE ISLAND HOSPITAL TRUST COMPANY ACCOUNT Purchases Date
Deposits
Common Stock
Tax-Exempt Securities
Account Balance June 7, 1967
$35,334.38
---
---
$35,334.38
August 24, 1967
---
$10,193.93
---
25,140.45
August 28, 1967
---
2,350.00
---
22,790.45
October 24 and November 2, 1967
---
---
$20,000.00 (approximately)
2,790.45 *
January 10, 1968
15,000.00 (approximately)
---
---
17,790.45
January 31, 1968
---
7,091.27
---
10,699.18
February 7, 1968
16,000.00 (approximately)
---
---
26,699.18
February 9, 1968
---
1,851.67
---
24,847.51
March 1, 1968
---
---
10,000.00 (approximately)
14,847.51
une 6, 1968
---
---
15,000.00 (approximately)
[152.49)
TOTALS
$66,334.38
$21,486.87
$45,000.00
$ (152.49)
*149 8 Petitioners' liquid assets during 1967 and 1968 included their checking account, as well as certain savings accounts. Their checking account usually had a balance of about $30,000, and the extent of their savings accounts is indicated by the aggregate amount of interest which they reported as having been received from such accounts in 1967 and 1968, namely, $4,453.02 and $4,506.76, respectively. During 1967 and 1968 the balances in these savings accounts were approximately $80,000 to $100,000 in the aggregate. A minor portion of the total interest received from those accounts (between a fourth and a fifth) came from so-called certificates of deposit which had maturities of one or two years, but there are indications in the record that such certificates may have matured near the latter part of 1967 or the early part of 1968 and the proceeds reinvested in other certificates. The record fails to establish that all of the bank accounts (including the certificates of deposit at maturity) were not available to meet any needs of petitioners, particularly, the payments in respect of petitioners' 1967 income tax liabilities, *150 hereinafter referred to. As previously indicated, petitioners reactivated discussions with the Industrial Trust Company in respect of obtaining a mortgage loan upon their new home. A loan agreement based upon a 5 3/4 percent interest rate was agreed upon, 9 and on or about January 15, 1968, petitioner received $37,200 as the proceeds of such loan which was then deposited in petitioners' checking account. Petitioners' cash requirements as of the end of 1967 in respect of their 1967 Federal income taxes consisted of the fourth installment of $14,478.16 on their Declaration of Estimated Tax which was due on January 15, 1968, and the final payment which was due on April 15, 1968, and which they estimated to be about $20,000. They discharged their liability for the fourth installment of estimated tax by check dated January 11, 1968. [1] The final payment due on April 15, 1968, was in fact $22,897.60. Another cash requirement that petitioner had in January, 1968, was the purchase of certain X-ray equipment, which he bought for $4,905. *151 On January 29, 1968, petitioners, by check drawn on their checking account, deposited $20,000 in their savings account with the Industrial Trust Company. The record does not establish that petitioners withdrew any funds 10 from that savings account to make the final payment on their 1967 taxes due on April 15, 1968. On their 1968 tax return petitioners claimed interest deductions aggregating $3,453.52, of which $1,946.87 was attributable to the mortgage loan on their new home, and $1,506.65 related to a mortgage loan on an office building. In his deficiency notice the Commissioner disallowed $1,946.87 of the claimed interest deduction. 11 OPINION RAUM, Judge: Section 265(2), I.R.C. 1954,[2] denies a deduction for interest on indebtedness which was incurred or continued to purchase or carry tax-exempt securities. The issue is whether the mortgage indebtedness on petitioners' home was incurred or continued by them to enable petitioner to purchase or carry tax-exempt securities. It is the Government's position that the indebtedness was incurred both *152 to enable petitioner to purchase approximately $25,000 of tax-exempt bonds during the ensuing months of 1968 and to continue to carry approximately $20,000 of such bonds which he had purchased in October and November of 1967. Petitioners, on the other hand, contend that the indebtedness was incurred for a wholly different purpose, namely, to make the remaining payments on their 1967 income tax liability as well as to purchase certain X-ray equipment. We find that petitioners have failed to establish any such purpose by convincing evidence, and we sustain the Commissioner. 12 Section 265(2) does not become operative merely because the taxpayer incurred or continued indebtedness at the *153 same time that he held tax-exempt securities. "The mere simultaneous existence of an indebtedness and the holding of tax-exempt securities does not cause section 265(2) to apply." John E. Leslie, 50 T.C. 11, 21, reversed for other reasons, 413 F. 2d 636 (C.A. 2), certiorari denied 396 U.S. 1007; see also Edmund F. Ball, 54 T.C. 1200, 1207; James C. Bradford, 60 T.C. , ; Batten v. United States, 322 F. Supp. 629, 631 (E.D. Va.). Rather, section 265(2) is applicable only when "the purpose for which the indebtedness is incurred or continued is to purchase or carry tax-exempt obligations" (emphasis supplied). Leslie v. Commissioner, supra, 413 F. 2d at 638; see also James C. Bradford, supra, 60 T.C. at ; Phipps v. United States, 414 F. 2d 1366, 1372 (Ct. Cl.); Batten v. United States, supra, 322 F. Supp. at 631. Thus, the deduction will be disallowed only where there is a "sufficiently direct relationship" between the incurrence or continuance of the indebtedness and the purchasing or carrying of the tax-exempt securities. See Wisconsin Cheeseman, Inc., v. United States, 388 F. 2d 420, 422 *154 (C.A. 7); Illinois Terminal Railroad Co. v. United States, 375 F. 2d 1016, 1021 (Ct. Cl.); Edmund F. Ball, supra, 54 T.C. at 1207; Kirchner, Moore & Co., 54 T.C. 940, 951. 13 The issue before us is thus one of applying settled principles to the peculiar facts of this case. In this respect we must begin here, as in tax cases generally, with the assumption that the Commissioner's determination is presumptively correct and that the taxpayer has the burden of proving it to be wrong. Bishop v. Commissioner, 342 F. 2d 757, 759 (C.A. 6), affirming 41 T.C. 1954; cf. Drybrough v. Commissioner, 376 F. 2d 350, 360 (C.A. 6), affirming 42 T.C. 1029, on this issue. In an apparent effort to carry their burden, petitioners offered the testimony of Mrs. Mariorenzi. She appeared to be familiar with her husband's affairs, but we found her testimony not only unsatisfactorily vague at various points, but also unconvincing and lacking in credibility in some important respects. We are not required to accept *155 her testimony as true. See Drybrough v. Commissioner, supra, 376 F. 2d at 360. We find incredible her explanation that the mortgage indebtedness was incurred to pay the fourth installment of estimated 1967 income taxes ($14,478.16) due on January 15, 1968 and the final payment (estimated at about $20,000) due on April 15, 1968. [3] 14 Her attempt to paint a picture of a lack of liquid assets to meet these obligations was wholly unpersuasive. At about the time the mortgage loan was taken down (on or about January 15, 1968), petitioner deposited approximately $15,000 in his "agency" investment account (January 10, 1968), and another $16,000 in this account less than a month later. It is incredible to us that petitioner would have made these deposits if he were strapped for funds to pay his taxes. The true picture, as we evaluate the record, is that petitioner had ample liquid funds available for his taxes, not only in his bank accounts but also from current earnings. We do not take seriously the suggestion that the payments for the new home in 1967 depleted petitioners' liquid assets so that they needed a mortgage loan to replace such assets in order to pay taxes. *156 We are satisfied on the record that the four payments which they made in 1967 for their new home were made out of current earnings. The level of their savings accounts in 1968 does not appear to be lower than in 1967, and indeed seems to be somewhat higher, notwithstanding that some $35,000 had been withdrawn from savings in 1967 in connection with petitioner's first deposit in the "agency" investment account. Nor are we persuaded that the $20,000 deposited in a savings account on January 29, 1968, had its source in the mortgage loan proceeds 15 or that it was "earmarked", as testified by Mrs. Mariorenzi, to pay the final installment of 1967 taxes due on April 15, 1968. There is no showing in the evidence whatever that funds were later withdrawn from that account to pay such taxes. We need not prolong the analysis of the evidence much further. There is considerably more in the record that shakes our confidence in the assertion that the mortgage indebtedness was incurred to make the two payments on petitioners' 1967 taxes. We simply do not believe it. [4]
*157 The more likely explanation for the loan is that it was made in order to assist petitioner in his investment program and in particular to acquire more tax exempt-bonds as well as to continue to carry the tax-exempt bonds which he had acquired several months earlier. Cf. Wisconsin Cheeseman, Inc. v. United States, supra, 388 F. 2d at 422; Illinois Terminal Railroad Co. v. United States, supra, 375 F. 2d at 1021. In reaching this conclusion we note that the Commissioner carefully disallowed the interest deduction only in respect of 16 the mortgage indebtedness on petitioners' house, and not in respect of the interest paid by petitioner on a mortgage loan on an office building. The latter loan was obviously made with a business purpose; the former, on the other hand, was made in respect of a fully paid for residence and had no purpose other than to enable petitioner to acquire or continue to carry tax-exempt securities. The two situations are sharply distinguishable. Cf. Wisconsin Cheeseman, Inc. v. United States, 388 F. 2d 420 (C.A. 7), where the Court of Appeals drew a distinction between two types of loans in respect of the same *158 issue now before us. Also, the facts of this case make it quite unlike the situation of a taxpayer who owns a mortgaged home and who may on occasion purchase some tax-exempt securities, or even that of a taxpayer who owns an unmortgaged home but takes out a mortgage loan for purposes wholly unconnected with tax-exempt securities that he may own. Decision will be entered for the respondent. Footnotes
*. All subsequent balance figures are approximate.↩
1. The parties have stipulated that petitioners made payment to the Internal Revenue Service on or about January 24, 1968, but this would appear to be the date that the Internal Revenue Service received payment on the check rather than the date that it was transmitted to or received by the Internal Revenue Service. ↩
2. SEC. 265. EXPENSES AND INTEREST RELATING TO TAX-EXEMPT INCOME. No deduction shall be allowed for - * * * (2) interest. - Interest on indebtedness incurred or continued to purchase or carry obligations * * * the interest on which is wholly exempt from the taxes imposed by this subtitle. * * * ↩
3. She did not include the first installment on 1968 estimated tax, which was also due on April 15, 1968, and which she said petitioners intended to pay out of current earnings. ↩
4. Nor do we have any confidence in the truth of the testimony that the indebtedness was incurred in part in order to finance the purchase of certain X-ray equipment that was acquired for somewhat less than $5,000. ↩